Virginia Susan CAUDILL, Appellant,

v.

COMMONWEALTH OF KENTUCKY, Appellee,

and

Johnathon Wayne Goforth, Appellant,

v.

Commonwealth of Kentucky, Appellee.

Nos. 2000–SC–0296–MR, 2000–SC–0297–MR.

Supreme Court of Kentucky.

June 12, 2003.

Rehearing Denied Dec. 18, 2003.

636

Donna L. Boyce, Appellate Branch Manager, Department of Public Advocacy, Randall L. Wheeler, Assistant Public Advocate, Frankfort, Counsel for Appellant Virginia Susan Caudill (2000-SC-0296-MR).

Julie Namkin, Assistant Public Advocate, Shannon Dupree, Assistant Public Advocate, Department of Public Advocacy, Frankfort, Counsel for Appellant Johnathon Wayne Goforth (2000-SC-0297-MR).

A.B. Chandler, III, Attorney General, Connie Vance Malone, Michael G. Wilson, Brian T. Judy, Assistant Attorneys General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee Commonwealth of Kentucky (2000–SC–0296–MR and 2000–SC–0297–MR).

## OPINION

COOPER, Justice.

### AFFIRMING

Following a trial by jury in the Fayette Circuit Court, Appellants Virginia Susan Caudill and Johnathon Wayne Goforth were each convicted of murder, robbery in the first degree, burglary in the first degree, arson in the second degree, and tampering with physical evidence. Each was sentenced to death for the murder conviction and to the maximum authorized penalties for the other four convictions. Both now appeal to this Court as a matter of right, Ky. Const. § 110(2)(b), KRS 532.075(1), asserting seventy-four claims of error. For the reasons explained herein, we affirm.

Lonetta White, age 73, was bludgeoned to death in her home in Lexington, Kentucky, during the early morning hours of March 15, 1998. Her body was found in the trunk of her burning automobile in a field several miles away. Her home was ransacked and numerous items of personal property, including two guns, jewelry, and a mink coat were stolen. Appellants Caudill and Goforth admitted they were present at the commission of all of these crimes. Each, however, accused the other of murdering and robbing the victim and of setting fire to the automobile.

Caudill had been living with the victim's son, Steve White, but had moved out of his house on either March 13 or 14 following an argument concerning Caudill's drug use. Caudill went to a nearby "crack house," a residence where drug users gathered to buy, sell, and ingest controlled substances, especially crack cocaine. There she encountered Goforth, a casual acquaintance whom she had not seen for about fifteen years. Caudill testified that, on the afternoon of March 14, Goforth gave her a ride to Mrs. White's residence

and that Caudill induced White to give her twenty or thirty dollars on the pretext that she needed the money to rent a room for the night. Instead, she returned to the crack house and used the money to purchase crack cocaine. At about 3:00 a.m. on March 15, Caudill and Goforth returned to Mrs. White's residence.

According to Caudill, she went to the door and told Mrs. White that she needed more money for the room rental. Goforth remained out of sight near the garage. When Mrs. White turned away to retrieve the money, Goforth burst through the door and attacked her without warning. Caudill did not identify the weapon used by Goforth but remembered that, during the course of the attack, Mrs. White pleaded with her to "please help me, Virginia." Goforth then took Caudill to a bedroom and bound her hands together. After killing White, Goforth ransacked the residence, loaded the jewelry, guns, and mink coat into his pickup truck, and wrapped the body in a carpet. He then prevailed upon Caudill to help him carry the body to the garage and load it into the trunk of Mrs. White's automobile. The two then drove both vehicles to a vacant field where Goforth doused Mrs. White's vehicle with gasoline and set it afire.

According to Goforth, Caudill induced Mrs. White to admit them into her residence under the pretext that they were having car trouble and needed to use White's telephone. Once inside, Caudill demanded that Mrs. White give her some money. When White refused, Caudill unexpectedly produced a roofer's hammer that she had surreptitiously removed from Goforth's pickup truck and struck White in the back of the head with full force. When Goforth asked Caudill why she had struck Mrs. White, Caudill struck her again. As Caudill continued to bludgeon the victim with the hammer, Goforth went into the living room, sat down on a sofa, and pon-

dered what he should do next. Caudill ransacked the victim's residence and loaded the stolen property into Goforth's pickup truck. She wrapped Mrs. White's body in the carpet. At Caudill's request, Goforth helped carry the body to the garage and load it into the trunk of White's automobile. They then drove both vehicles to a vacant field where Caudill doused White's automobile with gasoline and set it afire.

Cynthia Ellis, a jailhouse informant, testified that Caudill told her that she had gone to White's residence to obtain money to buy drugs. When White refused her request for money, Caudill struck White twice in the head with a clock that she pulled off the wall. Julia Davis, another jailhouse informant, testified that Caudill told her that she broke into the victim's home intending to steal money to buy drugs, but when the victim discovered her presence, she killed her, stole her guns and jewelry, and set fire to her car. Davis also testified that Caudill said White had pleaded with her to "[h]elp me, why are you doing this to me?"

Because of her known relationship with the victim's son, Caudill was questioned by police about the murder on the evening of March 15, 1998. She denied any involvement in the crimes and told the police that she had been with Goforth when the crimes were committed. The police unsuccessfully attempted to contact Goforth at his residence and left a message there for Goforth to contact them. Instead, Goforth and Caudill fled Fayette County. They spent several days at a cabin near Herrington Lake in Mercer County, then moved to Ocala, Florida, then to Gulfport, Mississippi. Caudill left Goforth in Gulfport and moved to New Orleans, Louisiana, where she was subsequently arrested November 11, 1998. She gave another statement at that time in which she admit-

ted her presence at the scene of the crimes but named Goforth as the perpetrator. Goforth was arrested and questioned in Gulfport, Mississippi, on December 8, 1998. He claimed Caudill killed Mrs. White with the hammer and, further, that an unidentified African–American male had assisted Caudill in the commission of the crimes (an assertion he admitted at trial was a fabrication). After her extradition to Kentucky, Caudill gave a third statement to police on December 9, 1998, which was substantially the same as her second statement.

## I. PRE–TRIAL ISSUES.

### 1. Indictment.

Counts 1 and 4 of the joint indictment provide:

Count 1: On or about the 15th day of March, 1998, in Fayette County, Kentucky, the above named Defendants committed the offense of Capital Murder by causing the death of Lonetta White while in the course of committing a First Degree Robbery and a First Degree Burglary.

. . .

Count 4: On or about the 15th day of March, 1998, in Fayette County, Kentucky, the above named Defendants committed the offense of Second Degree Arson by setting fire to an automobile belonging to Lonetta White.

█ Both appellants assert that counts 1 and 4 of their joint indictment charging them with murder and second-degree arson were invalid because they did not recite a culpable *mens rea;* and, thus, the Fayette Circuit Court never acquired subject matter jurisdiction over those charges. Neither appellant objected to these alleged defects, RCr 8.18, or sought a bill of particulars, RCr 6.22. Criminal Rule 6.10(2) provides that an indictment is sufficient if it contains "a plain, concise and definite statement of the essential facts constitut-

ing the specific offense with which the defendant is charged." *Thomas v. Commonwealth,* Ky., 931 S.W.2d 446 (1996), holds that RCr 6.10(1) only requires that the indictment provide information sufficient to give the defendant notice of the charge against him/her and that an indictment is not invalid merely because of factual incompleteness or lack of specificity. *Id.* at 449.

In addition to describing the offense, the indictment also identified the applicable sections of the penal code, *i.e.,* KRS 507.020 and KRS 513.030. Although arguably incomplete under RCr 6.10(2), counts 1 and 4 of the indictment provided sufficient information to serve notice on appellants of the charges against them. Thus, counts 1 and 4 were not invalid and sufficed to confer subject matter jurisdiction on the Fayette Circuit Court with respect to the charged offenses. *Thomas,* at 449–50.

### 2. Arraignment.

█ Both appellants assert that their arraignments by closed circuit television violated RCr 8.02 (arraignment to be conducted in open court), RCr 8.28 (defendant shall be present at the arraignment), and Rule 8 of the Fayette Circuit Court (arraignment to be in open court), as well as their constitutional rights to due process and equal protection. All of these arguments except the equal protection issue were addressed and rejected in *Commonwealth v. Ingram,* Ky., 46 S.W.3d 569, 570–72 (2001). The equal protection issue is premised upon appellants' perceptions that a non-indigent defendant could have obtained some additional benefit from being in personal attendance in court at arraignment. However, a review of the videotapes of the arraignments indicates that each appellant had counsel physically present at the jail, thus immediately available for consultation during the arraignment;

each appellant could see the judge on the closed circuit monitor; and each appellant received a copy of the indictment, was advised of the charges against him/her, and entered a plea of not guilty. In other words, the procedure was exactly the same as any other routine arraignment except that the judge and the defendant viewed each other by closed circuit monitor instead of face-to-face. We perceive no denial of equal protection in that respect.

### 3. Joinder.

■ Caudill asserts that the trial judge erroneously denied her motion for a separate trial because she and Goforth had antagonistic defenses and the *Bruton*-required redaction of her pre-trial confessions to delete any reference to Goforth, *see Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987), and *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), forced her to give up her right to remain silent and testify to Goforth's culpability in order to shift the blame from herself.

Joinder is appropriate if the defendants "are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses." RCr 6.20; *Jackson v. Commonwealth*, Ky., 670 S.W.2d 828, 834 (1984). "Even if the defendants attempt to cast blame on each other, severance is not required." *Gabow v. Commonwealth*, Ky., 34 S.W.3d 63, 71 (2000) (*citing United States v. Arthur*, 949 F.2d 211, 217–18 (6th Cir.1991)).

> [N]either antagonistic defenses nor the fact that the evidence for or against one defendant incriminates the other amounts, by itself, to unfair prejudice. . . . That different defendants alleged to have been involved in the same transaction have conflicting versions of what took place, or the extent to which

they participated in it, vel non, is a reason for rather than against a joint trial. If one is lying it is easier for the truth to be determined if all are required to be tried together.

*Ware v. Commonwealth*, Ky., 537 S.W.2d 174, 177 (1976). The trial judge did not abuse his discretion in denying Caudill's motion for a separate trial.

### 4. Absence from pre-trial hearings.

Criminal Rule 8.28(1) provides:

> The defendant shall be present at the arraignment, at every critical stage of the trial including the empaneling of the jury and the return of the verdict, and at the imposition of the sentence.

In addition to their claims that they were not "present" at their closed-circuit television arraignments, an issue resolved by *Commonwealth v. Ingram, supra*, at 570–71, both appellants complain of their absence from a hearing held on January 27, 2000, eleven days before trial; and Caudill complains of her absence from a hearing held on February 4, 2000, three days before trial.

### (a) January 27, 2000.

■ The trial judge offered to have both appellants brought up from the jail to attend the January 27, 2000, hearing. However, the attorneys for both appellants expressly waived their respective clients' presence at that hearing. *Fugate v. Commonwealth*, Ky., 62 S.W.3d 15, 18–19 (2001). Furthermore, nothing that occurred at that hearing could be characterized as a "critical stage of the trial." Much of the hearing was consumed by the trial judge's review of juror requests for excusal or postponement of jury service for health or hardship reasons. While we applaud the trial judge for allowing counsel to participate in this process, such excusals and postponements are within the discretion of the trial judge, Admin.

Proc., Part II, § 12(1), KRS 29A.100(1), who is not required to make those decisions in open court or in the presence of or consultation with any parties or their counsel. The trial judge is only required to record the reasons for the excusals or postponements on the juror qualification forms so they can be reviewed for abuse of discretion. Admin. Proc., Part II, § 12(2); KRS 29A.100(2); *Sanborn v. Commonwealth*, Ky., 754 S.W.2d 534, 548–49 (1988). Nothing else was discussed except scheduling problems related to Caudill's last-minute notice (exactly twenty days before the trial date of February 7, 2000) of her intention to introduce evidence of mental illness, KRS 504.070(1), the Commonwealth's failure to complete the *Bruton*-redaction of appellants' respective pretrial statements, and the number of peremptory strikes to be allotted to each side at trial.

Thus, the January 27, 2000, hearing was not a "critical stage of the trial" and appellants' presence at that hearing had been validly waived by their respective counsel.

*(b) February 4, 2000.*

■ This hearing was held from 4:11 p.m. until 5:16 p.m. on the Friday before trial. Goforth was present. However, Caudill was absent because she was undergoing a mental health examination by the prosecutor's expert, Dr. Cooley. KRS 504.070(2). The matters resolved at the hearing on February 4, 2000, were (1) Caudill's motion *in limine*, filed on February 2, 2000, five days before trial, to suppress eight items of evidence (the prosecutor conceded six of the issues and the remaining two were resolved solely by legal argument); (2) Caudill's motion to suppress that portion of her March 15, 1998, statement that was made after she requested an attorney (the prosecutor conceded the issue); (3) whether Goforth's statement should be redacted to exclude his assertion that an unidentified African–

American male had assisted Caudill in the commission of the crimes (the trial judge ruled, per *Bruton, supra*, that the reference should be redacted because it incriminated Caudill); (4) Goforth's motion to preclude the Commonwealth from introducing a videotape of Caudill's "walk-through" of the crime scene with police detectives (the prosecutor agreed not to introduce the videotape and whether Caudill could introduce it, herself, was not addressed); (5) Caudill's motion for a separate trial, which had been filed on the morning of the hearing (the motion was overruled on the basis of RCr 6.20 and *Ware v. Commonwealth, supra*); and (6) whether, since the offenses were committed prior to July 15, 1998, the jury should be instructed on the penalty of life without parole in the event of a conviction of murder. *See Commonwealth v. Phon*, Ky., 17 S.W.3d 106, 108 (2000). Resolution of that issue was postponed until trial.

■ Thus, no evidentiary hearing was held and all of the issues addressed were resolved by legal argument. A defendant is not required to be present during the argument of legal issues between court and counsel. *Tamme v. Commonwealth*, Ky., 973 S.W.2d 13, 38 (1998); *Thomas v. Commonwealth*, Ky., 437 S.W.2d 512, 515 (1968); *Harris v. Commonwealth*, Ky., 285 S.W.2d 489, 491 (1955). "A defendant's absence means little when, as in the present case, the trial court's communication merely involves a question of law rather than fact. In such a case, a defendant's presence can be of no help to the defense." *United States v. Dockter*, 58 F.3d 1284, 1287 (8th Cir.1995).

## II. JURY SELECTION ISSUES.

### 1. Postponement of jury service.

During the January 27, 2000, hearing, the trial judge informed the attorneys of his intent to postpone jury service for

eight full-time students until the end of the school year because he felt it would be "difficult," *i.e.*, a hardship, for such students to lose the time and money they had invested in their education. The trial judge then inquired, "Does anybody object to that?" Counsel for both appellants responded, "No." The trial judge also postponed jury service for a college professor who taught two class hours three days per week. During the February 4, 2000, hearing, the trial judge informed counsel that he had postponed jury service for another full-time student, and during voir dire at trial, he postponed jury service for three more full-time students.

■■■ Counsel's decisions with respect to jury selection are regarded as matters of trial strategy. *Hodge v. Commonwealth*, Ky., 17 S.W.3d 824, 837 (2000). Thus, defense counsels' agreement to the postponement of jury service for full-time students was a matter of trial strategy. Further, as noted in Part I, issue 4(a), *supra*, whether to postpone a prospective juror's service because of hardship is within the sound discretion of the trial judge. We discern no abuse of discretion in this regard.

■■■ Nor did the trial judge's decision to postpone jury service for students amount to a "systematic exclusion" in violation of the appellants' right to a jury drawn from a "fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 531, 95 S.Ct. 692, 698, 42 L.Ed.2d 690 (1975). A necessary condition for "systematic exclusion" is that the group allegedly excluded be a "distinctive group." *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579 (1979). A "distinctive group" must comprise a substantial percentage of the county population, and, absent a showing of numerosity and lack of community needs, no profession or occupation is considered a distinctive group. *Commonwealth v. McFerron*,

Ky., 680 S.W.2d 924 (1984), *overruling Colvin v. Commonwealth*, Ky., 570 S.W.2d 281 (1978) (schoolteachers), and *overruling by implication Reid v. Commonwealth*, Ky. App., 659 S.W.2d 217 (1983) (doctors and lawyers). In fact, we explicitly held in *Ford v. Commonwealth*, Ky., 665 S.W.2d 304 (1983), that "college students . . . are not distinctive . . . as a class." *Id.* at 308. Nor are "young adults" a distinctive group whose underrepresentation would deny a defendant the right to a "fair cross section." *Smith v. Commonwealth*, Ky., 734 S.W.2d 437, 442 (1987); *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519, 521 (1984); *Ford, supra,* at 308.

*2. Death qualification question.*

During individual voir dire, the trial judge "death qualified" the jury panel by making the following inquiry of each prospective juror:

This is a capital murder case. If you find the defendant *guilty of murder*, there are five ranges of penalty you'll be instructed to consider—not less than twenty nor more than fifty years, life, life without the possibility of parole for twenty-five years, life without the possibility of parole, and death. If you determine under the facts of this case, and the instructions of the Court, beyond a reasonable doubt, that the defendant is *guilty of murder*, can you consider the entire range of penalties provided by the statutes of the Commonwealth of Kentucky as I have just outlined them to you? [Emphasis added.]

■■■ Appellants assert that the emphasized language should have been "guilty of aggravated murder," not "guilty of murder," because death, life without parole, and life without parole for twenty-five years, are available penalties only if the jury also finds beyond a reasonable doubt the existence of an aggravating circumstance. KRS 532.025(3). Appellants do

not assert that this fact caused some jurors to disclaim an ability to consider death as a penalty for "mere" murder and, thus, to be excused for cause as not "death qualified." Murder is a capital offense, KRS 507.020(2), and the range of penalties for a capital offense are those recited in the trial judge's inquiry. KRS 532.030(1). Rather, Appellants assert that jurors who would state that they could consider the *minimum* penalty for a "mere murder" might not be able to consider that penalty for an aggravated murder. Either way, no error occurred.

The leading United States Supreme Court cases on "death qualification," *i.e.,* *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), and *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), all address the circumstances under which a potential juror may be excused for cause because of the juror's bias against imposition of the death penalty. *Witherspoon* held that strikes for cause could not be employed to empanel a jury predisposed to return a verdict of death, 391 U.S. at 521–23, 88 S.Ct. at 1776–77; and that, "[u]nless a venireman states unambiguously that he would automatically vote against the imposition of capital punishment no matter what the trial might reveal," *id.* at 515 n. 9, 88 S.Ct. at 1773 n. 9, it cannot be assumed that such is that person's position simply because the juror expressed reservations or scruples about the death penalty. *Id.* Although *Witherspoon* also states "[t]hat the most that can be demanded of a venireman in this regard is that he be willing to *consider* all of the penalties provided by state law," *id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21 (emphasis in original), *Adams, supra,* explained that "*Witherspoon* is not a ground for challenging any prospective juror. It is rather a limitation on the State's

power to exclude." 448 U.S. at 47–48, 100 S.Ct. at 2528. "[T]he proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment ... is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Witt, supra,* at 424, 105 S.Ct. at 852, *quoting Adams, supra,* at 45, 100 S.Ct. at 2526. If so, the removal of so-called "'*Witherspoon*-excludables' serves the State's entirely proper interest in obtaining a single jury that could impartially decide all the issues in [a death penalty] case." *McCree, supra,* at 180, 106 S.Ct. at 1768.

In *Morgan v. Illinois,* 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992), the Court expanded this principle to require that a jury be "life qualified" by excluding those jurors who would automatically impose death upon a finding of guilt.

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror.

*Id.* at 729, 112 S.Ct. at 2229.

▮ No jurisdiction other than Kentucky has ever held that a juror is disqualified simply because he or she cannot consider imposition of the minimum authorized sentence for conviction of an offense for which death is an authorized penalty. That proposition first entered our jurisprudence via *obiter dictum* in *Grooms v. Commonwealth,* Ky., 756 S.W.2d 131, 137 (1988). *Grooms* anticipated the holding in *Morgan, supra,* by holding that it was reversible error not to

excuse for cause a juror who "favors the death penalty to the exclusion of all other penalties as punishment for intentional murder." 756 S.W.2d at 137. However, *Grooms* went on to say that "a juror should be excused for cause if he would be unable in any case, no matter how extenuating the circumstances may be, to consider the imposition of the minimum penalty prescribed by law." *Id.*

Giving corporeality to the *Grooms* dictum, *Morris v. Commonwealth*, Ky., 766 S.W.2d 58 (1989), held that:

> [T]he lower court should have informed the jury there are four penalties for the capital offense of intentional murder— viz, death, life without parole or probation for 25 years, life, or a term of not less than 20 years. KRS 532.030. The jury should be asked the simple question "If you determine under the instructions of the court beyond a reasonable doubt that the defendant is guilty of intentional murder, could you consider the entire range of penalties provided by statutes of this Commonwealth as outlined to you?"

*Id.* at 60. Of course, that is almost verbatim the question asked by the trial judge in this case, except that the range of penalties for a capital offense now includes life without parole. KRS 532.030(1).

Although *Morris* also held that "[b]oth the Commonwealth and the defendant are entitled to a panel of jurors who will consider the entire range of punishment," *id.* at 60, *Davis v. Commonwealth*, Ky., 795 S.W.2d 942 (1990), explained that while "[i]t would be a better practice for a trial judge conducting death penalty voir dire pursuant to RCr 9.38 [1] to inquire about a juror's ability to consider the full range of penalties in capital cases," the requirement is satisfied if defense counsel is afforded the opportunity to do so. *Id.* at 952. That

is in accord with *Witt, supra,* that "[a]s with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality." 469 U.S. at 423, 105 S.Ct. at 852.

■ Here, neither defense counsel was precluded from questioning any potential juror with respect to that juror's ability to consider imposition of the minimum penalty for "aggravated murder." Indeed, counsel asked the following question of several prospective jurors:

> Assume in this case that we get to the sentencing phase. That means that you've already found the defendant guilty of murder and an aggravating circumstance, like a burglary or a robbery or a rape or something like that. If that's the case, can you give a serious and honest consideration to a minimum sentence of twenty years?

(In fact, if a defendant is found guilty of murder and burglary, robbery or rape, the minimum sentence would be thirty years, not twenty years (twenty years for murder, KRS 532.030(1), plus ten years for the class B felony, KRS 532.060(2)(b)). Regardless, the trial judge's death penalty inquiry did not misstate the law or mislead the jury. Any perceived deficiency was cured by permitting defense counsel to further clarify the inquiry).

*3. Refusal to excuse two jurors for cause.*

Both appellants assert that the trial judge erred by refusing to excuse Jurors 871 and 884 for cause.

■ *Juror 871* stated that he could consider the full range of penalties. Ap-

---

1. Actually, RCr 9.38 specifically does not require the trial judge to ask any voir dire questions during the empaneling of a jury in a capital case.

pellants complain that when asked whether he could consider a "minimal sentence" for an aggravated murder, he responded "I can't tell you now, I would have to hear all the evidence," and could not think of a specific case where he could consider a "minimal sentence" for a conviction of murder accompanied by an aggravating circumstance. Of course, the appropriate inquiry under *Grooms* and *Morris* is not whether a juror can consider "a *minimal* sentence," but whether he can consider "the *minimum* sentence." Juror 871 assured defense counsel that he could consider mitigating circumstances and that he would not sentence on the basis of "an eye for an eye" but would need to hear all the facts.

■■■ *Juror 884* stated that she was "for the death penalty," but could consider the full range of penalties and would not automatically impose or exclude any penalty. Although she stated at one point that she would not be able to consider the "lower range" for convictions of both murder and robbery or burglary, she also stated that she could consider it if, based on all the facts, she thought it was an appropriate punishment. As stated *supra*, the minimum sentence for conviction of both murder and robbery or burglary would be thirty years, not twenty years. Further, in *Mabe v. Commonwealth*, Ky., 884 S.W.2d 668, 671 (1994), we substantially diluted the strict excusal requirement articulated in *Grooms* and *Morris*:

> Many jurors find it difficult to conceive of minimum punishment when the facts as given suggest only the most severe punishment.... A per se disqualification is not required merely because a juror does not instantly embrace every legal concept presented during voir dire examination. The test is not whether a juror agrees with the law when it is presented in the most extreme manner. The test is whether, after having heard

all of the evidence, the prospective juror can conform his views to the requirements of the law and render a fair and impartial verdict....

> "... Jurors cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best suited to determine the competency to serve impartially. The trial judge properly may choose to believe those statements that were the most fully articulated or that appeared to have been least influenced by leading." ·

884 S.W.2d at 671 (*quoting Patton v. Yount*, 467 U.S. 1025, 1038–39, 104 S.Ct. 2885, 2892–93, 81 L.Ed.2d 847 (1984)). *See also Foley v. Commonwealth*, Ky., 942 S.W.2d 876, 882 n. 5 (1996). The trial judge did not abuse his discretion in declining to excuse Jurors 871 and 884 for cause.

*4. Excusal of two jurors for cause.*

Both appellants assert that the trial judge erred in excusing Jurors 872 and 939 for cause.

■■■ *Juror 872* initially responded "Yes" to the trial judge's qualification question as to whether she could consider the full range of penalties. Later, however, she stated three times that she could not consider the death penalty. Her final statement during attempted rehabilitation by defense counsel was: "At this point, I could not consider the death penalty. I could not do that."

■■■ After a long hesitation, *Juror 939* also initially responded "Yes" to the trial judge's qualification question. Later, however, she indicated that she had not understood ("didn't get") the fact that death was a possible penalty and stated that even if the facts of the case warranted it, she could not impose the death penalty.

The trial judge did not abuse his discretion in excusing Jurors 872 and 939. *Hodge,* 17 S.W.3d at 838 ("This argument has been consistently rejected by both the United States Supreme Court and by this Court.").

5. *Extra peremptory strikes.*

■ Appellants do not claim that the trial judge did not allot them the number of peremptory strikes required by RCr 9.40 but claim it was an abuse of discretion not to allot them extra strikes because this is a death penalty case. "Whether to grant additional peremptories is within the discretion of the trial judge." *Tamme,* 973 S.W.2d at 26. We discern no abuse of that discretion.

6. *Batson challenge.*

■ The victim, Lonetta White, was an African–American woman. Appellants are both Caucasians. The Commonwealth exercised eight of its nine peremptory strikes against Caucasian men and Appellants responded with a *Batson* challenge, claiming that the peremptories were both racially and gender motivated. *J.E.B. v. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994); *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

To date, the United States Supreme Court has not addressed whether *Batson* applies to race-based peremptory strikes against Caucasians. However, a number of federal courts of appeals have decided that it does. *E.g., United States v. Allen-Brown,* 243 F.3d 1293, 1298 (11th Cir.2001) (trial court properly required defendant to give race-neutral reasons for striking Caucasian jurors); *United States v. Parsee,* 178 F.3d 374, 378 (5th Cir.1999) (upholding government's *Batson* challenge to four of the ten Caucasian jurors struck by the defendant); *United States v. Kelley,* 140 F.3d 596, 606 (5th Cir.1998) (upholding trial court's finding that defendant's peremptory strikes of Caucasian jurors pre-

sented a prima facie case of racial discrimination); *Government of Virgin Islands v. Forte,* 865 F.2d 59, 64 (3d Cir.1989) ("*Batson* applies to both whites and blacks."); *Roman v. Abrams,* 822 F.2d 214, 227 (2d Cir.1987) (Caucasians are a cognizable group for Sixth Amendment purposes and trial judge properly required race-neutral reasons for prosecution's exercise of peremptory challenges against Caucasian jurors in trial of Caucasian defendant).

The prosecutor did not contest whether *Batson* applies to peremptory strikes of Caucasian jurors and stated his reasons for the exercise of all nine of the Commonwealth's peremptory strikes. Six peremptories were used to excuse potential jurors who had expressed serious reservations about the death penalty. Another was used to excuse a potential juror who had only an elementary school education and did not seem fully cognizant of the nature of the proceedings. Another was used to excuse a close personal friend of one of Caudill's attorneys. The last was used to excuse a potential juror who expressed what the prosecutor perceived to be hostility toward the police and the judicial system. The trial judge found all of these reasons to be race-neutral and we are unable to conclude that his finding in that regard was clearly erroneous. *Hernandez v. New York,* 500 U.S. 352, 369, 111 S.Ct. 1859, 1871, 114 L.Ed.2d 395 (1991); *Commonwealth v. Snodgrass,* Ky., 831 S.W.2d 176, 179 (1992).

### III. GUILT PHASE EVIDENCE.

1. *Redacted statements.*

■ During the Commonwealth's case-in-chief, Detective Lyons read to the jury the *Bruton*-redacted versions of Caudill's pre-trial statements made on March 15, 1998, November 11, 1998, and December 9, 1998, and Goforth's pre-trial statement made on December 8, 1998. Appellants do

not claim that the statements were not sufficiently redacted in accordance with the requirements of *Gray v. Maryland* and *Richardson v. Marsh, supra.* Instead, they claim that the redactions (1) rendered the statements disjointed and (2) deleted appellants' respective defenses ("I didn't do it; he/she did it."), essentially forcing them to forego their respective rights to remain silent by testifying in their own defense.

The argument ignores the Commonwealth's right to present to the jury, whether at a separate or a joint trial, the self-inculpatory portions of each defendant's out-of-court statements so long as those portions do not violate a codefendant's right of confrontation. The hearsay aspect of the statement is satisfied by the exception for admissions, KRE 801A(b)(1). However, the rule only applies to admissions offered *against* the party that made the admission. Thus, even absent the *Bruton* issue, neither KRE 801A(b)(1) nor the "rule of completeness," KRE 106, would have automatically authorized either of these defendants to introduce his or her own out-of-court statement(s) for the purpose of asserting a defense without subjecting that defendant to cross-examination—even though the Commonwealth introduced those portions of the statements that were self-inculpatory. *Gabow,* 34 S.W.3d at 68 n. 2. Appellants could have jointly stood on their redacted statements in which each admitted only his/her presence at the crime scenes and neither admitted committing the crimes. The fact that both, instead, chose to testify and affirmatively assert their respective defenses affords no basis for reversal.

As the appellants complain, the redacted versions of the statements were necessarily disjointed. For that reason, the trial judge told the jury prior to the reading of Caudill's November 11, 1998, statement that "only portions of the state-

ment will be read to you." We are unable to conclude that the jury must have assumed from that admonition that the omitted portions inculpated Goforth.

Finally, appellants assert that the trial judge erred by not admonishing the jury that each statement could be considered only against the party who made it. No admonition was requested, *Hall v. Commonwealth,* Ky., 817 S.W.2d 228, 229 (1991), *overruled on other grounds by Commonwealth v. Ramsey,* Ky., 920 S.W.2d 526 (1996), *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414, 418 (1985), and appellants are mistaken in their belief that the Constitution requires it. Prior to *Bruton,* it was held that the prejudicial effect of an out-of-court statement by a non-testifying codefendant that inculpated a defendant could be cured by giving the jury a limiting admonition that it should not consider the codefendant's statement in determining the guilt of the defendant. *Delli Paoli v. United States,* 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). *Bruton* held that this limiting admonition was insufficient to cure the prejudice resulting from the defendant's inability to cross-examine his/her accuser.

> Despite the concededly clear instructions to the jury to disregard Evans' inadmissible hearsay evidence inculpating petitioner, in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination. The effect is the same as if there had been no instruction at all.

391 U.S. at 137, 88 S.Ct. at 1628.

By forbidding the use in a joint trial of a non-testifying codefendant's out-of-court statement that inculpates a defendant, *Bruton* eliminated the need for a limiting admonition. In *Richardson, supra,* the United States Supreme Court authorized the admission of a codefendant's confession

that was redacted to omit all references to the defendant or to the fact that anyone other than the codefendant/declarant had participated in the crime. 481 U.S. at 211, 107 S.Ct. at 1709. In *Richardson*, a limiting instruction had been given, *id.*, so the Court was not required to decide whether the absence of such an instruction, even if not requested, mandated reversal. We conclude now that it does not. If the nontestifying codefendant's out-of-court statement is so redacted that it does not inculpate the defendant in the commission of the crime, the limiting instruction might well be viewed as calling the jury's attention to the very fact that the redaction was intended to suppress, *i.e.*, that the deleted portions of the codefendant's confession would have implicated the defendant in the commission of the crime. As in *Hall, supra,* at 229, we view this as a matter of trial strategy and decline to treat as automatic reversible error the failure to give an unrequested limiting admonition.

### 2. *Photographs of reconstructed skull.*

 The Commonwealth's forensic anthropologist partially reconstructed the victim's skull from bones found on or inside her body to assist in estimating the number and nature of the blows inflicted upon her. The Commonwealth did not introduce the skull, itself, but only three photographs that were used to explain the testimony of the witness. Even bones and bone fragments from the victim's body are admissible if relevant. *Tamme*, 973 S.W.2d at 36; *Tackett v. Commonwealth*, 245 Ky. 98, 53 S.W.2d 218 (1932); *Robey v. Commonwealth*, 243 Ky. 407, 48 S.W.2d 822 (1932). Likewise, "even gruesome photographs are admissible if they have probative value." *Tamme*, at 36; *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835, 843 (1990). The number and nature of the blows inflicted upon the victim were relevant to prove the *corpus delicti* and to refute a potential claim that the person who inflicted the blows lacked the intent to kill the victim. KRS 507.030(1)(a).

### 3. *Character evidence.*

 The following colloquy occurred during the prosecutor's direct examination of the victim's sister, Alma Gross:

Q. Was [the victim] a careful person about who she would let into her house?

A. Very cautious.

Q. Tell me about that.

A. Every time she would talk to me she would say, "Be sure to lock your doors; don't open your door after dark; don't let nobody in." She was very cautious.

 Mrs. Gross explained later in her testimony that her sister "didn't like the part of town that I lived in and that was why she always stressed to me to be cautious." That explanation cured any possible error with respect to Gross's response to the prosecutor's second question because it clarified that the victim was advising Gross to be cautious, not that the victim, herself, was a cautious person. However, it did not cure the error with respect to the first question which elicited that the victim was "very cautious" about who she let into her house. KRE 404(a) provides:

> Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except [exceptions not applicable].

The evidence of the victim's character for being "very cautious" about who she let into her house was admitted to prove action in conformity therewith, *i.e.*, that she did not invite the appellants into her home on the night she was killed, thus, they committed burglary when they "unlawfully" entered her residence with the intent to commit a crime. KRS 511.020(1); *Robey v. Commonwealth*, Ky., 943 S.W.2d

616, 620 (1997). The admission of this evidence was erroneous.

 However, the erroneous admission of evidence is subject to harmless error analysis even in a case where the death penalty has been imposed. *Satterwhite v. Texas*, 486 U.S. 249, 257–58, 108 S.Ct. 1792, 1798, 100 L.Ed.2d 284 (1988); *Stanford v. Commonwealth*, Ky., 734 S.W.2d 781, 787 (1987). The inquiry is whether the "error was harmless beyond a reasonable doubt," *Stanford* at 787, or, said another way, "whether the circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed." *Sanders v. Commonwealth*, Ky., 801 S.W.2d 665, 668 (1990).

 The erroneously admitted character evidence amounted only to circumstantial evidence creating an inference that appellants did not enter the victim's home with her permission. Caudill admitted in her testimony that she and Goforth did not have permission to enter the residence but that Goforth burst into the residence and attacked the victim as she was walking away from the door. Goforth testified that Caudill obtained admission into the victim's home under the pretext that they needed to use her telephone because of "car trouble." Goforth admittedly knew that there was no "car trouble" and that they were at the victim's home for the purpose of acquiring the victim's money.

All of our burglary and trespass statutes, including KRS 511.020, require as an element of the offense that the defendant "knowingly enter[ed] or remain[ed] unlawfully" in the victim's building. In that respect, our statute differs from Section 221.1 of the Model Penal Code and, instead, corresponds with Section 140.30 of the New York Penal Law. *See* KRS 511.020 (1974 commentary). New York courts have consistently held that entry by deception, trickery, or misrepresentation satisfies the "unlawful entry" element of the offense. *E.g., People v. Mitchell*, 254 A.D.2d 830, 679 N.Y.S.2d 761, 761–62 (N.Y.App.Div.1998); *People v. Johnson*, 190 A.D.2d 503, 593 N.Y.S.2d 35, 36 (N.Y.App.Div.1993); *People v. Harrison*, 151 A.D.2d 778, 543 N.Y.S.2d 108, 110 (N.Y.App.Div.1989). We find that reasoning to be sound and are satisfied that no reasonable juror would conclude that "entry by deception, trickery, or misrepresentation" equates with "entry by invitation." Since both appellants admitted at trial that they "unlawfully entered" the victim's home, the erroneously admitted circumstantial evidence of their unlawful entry was harmless beyond a reasonable doubt.

*4. Other crimes, wrongs, or acts.*

 a. Caudill asserts that evidence that she was interviewed in a New Orleans jail on November 11, 1998, violated KRE 404(b)'s proscription against admission of evidence of other crimes to prove her bad character. Since it was not shown that Caudill was jailed on charges other than those related to these offenses, any perceived error was harmless beyond a reasonable doubt.

 b. Caudill also asserts that Jeanette Holden's testimony that Caudill told her that she knew where they could get $3,000.00 and asked whether Holden was willing to hurt somebody violated KRE 404(b)'s proscription against admission of evidence of other wrongs or acts to prove action in conformity therewith. However, at a suppression hearing on the issue, Holden testified that the incident occurred after Caudill's former boyfriend, Thomas Garrett, committed suicide and while Caudill was looking for a place to stay. Caudill testified that she learned of Garrett's death on Thursday, March 12, 1998, and that she moved out of Steve White's house on either Friday night, March 13, 1998, or

Saturday afternoon, March 14, 1998. Lonetta White was killed and robbed at approximately 3:30 a.m. on March 15, 1998. Caudill's statement to Holden was sufficiently proximate to the murder and robbery of White for the jury to properly conclude that the statement manifested an "intent" and "plan" to harm and rob White and, thus, was within the exceptions set forth in KRE 404(b)(1).

■ c. Goforth asserts that KRE 404(b) was violated by Veronica Jones's testimony that Goforth ingested cocaine both orally and intravenously for up to thirty days before the crimes, Caudill's testimony that he ingested cocaine intravenously while at Lake Herrington after the crimes, and the testimony of Penny Hunter, Goforth's domestic companion, that she had to make the house payments because Goforth spent all of his money on crack cocaine. This evidence was relevant to show motive. "Evidence of a drug habit, along with evidence of insufficient funds to support that habit, is relevant to show a motive to commit a crime in order to gain money to buy drugs." *Adkins v. Commonwealth*, Ky., 96 S.W.3d 779, 793 (2003).

### 5. Impeachment of Jeanette Holden.

■ Caudill complains that she was precluded from impeaching the credibility of Jeanette Holden and thereby prevented from exercising her constitutional right of confrontation. U.S. Const. amend. VI; Ky. Const. § 11. In fact, Caudill was permitted to elicit from Holden the facts that Holden was a convicted felon, that she was serving a ten-year sentence, and that she would like for the parole board to know that she had cooperated with the prosecution of this case. When asked if she had helped Detective Lyons with any other cases, Holden replied that she had not. Defense counsel then inquired whether Holden had helped any police detective with any other case, specifically a case involving Christina Halvorsen. Upon the

prosecutor's objection, the trial judge questioned defense counsel as to whether he had information that Holden had received or been promised any benefit for her cooperation in that case. When defense counsel replied that he did not, the objection was sustained. Thus, Holden did not answer the question and what answer she might have made was not preserved by an avowal. KRE 103(a)(2).

■ Limitations on cross-examination, including cross-examination to expose bias or prejudice, *Parsley v. Commonwealth*, Ky., 306 S.W.2d 284, 285 (1957), involve a fundamental constitutional right and should be cautiously applied. *Davis v. Alaska*, 415 U.S. 308, 320, 94 S.Ct. 1105, 1112, 39 L.Ed.2d 347 (1974). Nevertheless, "[s]o long as a reasonably complete picture of the witness' veracity, bias and motivation is developed, the judge enjoys power and discretion to set appropriate boundaries." *Commonwealth v. Maddox*, Ky., 955 S.W.2d 718, 721 (1997) (*quoting United States v. Boylan*, 898 F.2d 230, 254 (1st Cir.1990)).

[A] connection must be established between the cross-examination proposed to be undertaken and the facts in evidence. A defendant is not at liberty to present unsupported theories in the guise of cross-examination and invite the jury to speculate as to some cause other than one supported by the evidence.

*Maddox*, at 721.

■ Caudill was able to show that Holden was a convicted felon, was serving a prison term, and hoped the parole board would give consideration to her cooperation in this case. The trial judge did not abuse his discretion in sustaining the prosecutor's objection to defense counsel's attempted inquiry as to whether Holden had cooperated with the police in another case absent a good faith belief that she had benefitted from that cooperation. The

mere fact that a witness helped the police in an unrelated case is not evidence of bias in this case and is not an adverse reflection on the witness's credibility in general.

Finally, absent an avowal, we have no way of knowing what Holden's response would have been or whether it would have been beneficial to Caudill. *Commonwealth v. Ferrell*, Ky., 17 S.W.3d 520, 525 (2000).

### 6. Evidence evoking sympathy for victim.

 Much of appellants' complaints relate to claimed irrelevancy of evidence that "humanized" the victim and described the horrific nature of her fatal injuries. We have stated many times that evidence that a murder victim was not a mere statistic but an individual human being with a personality and activities does not unduly prejudice the defendant or inflame the jury. *Stopher v. Commonwealth*, Ky., 57 S.W.3d 787, 802–03 (2001); *Hodge*, 17 S.W.3d at 847; *Bowling v. Commonwealth*, Ky., 942 S.W.2d 293, 302–03 (1997); *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519, 523 (1984). Appellants cite no authority for the proposition that the nature and extent of a murder victim's injuries is irrelevant and we are aware of none.

### 7. Goforth's cross-examination of Caudill.

During cross-examination of Caudill by Goforth's attorney, Caudill was asked (a) whether Edna Sharp was mistaken when she testified that she knew Johnathon Goforth? (to which Caudill replied that Sharp was mistaken); (b) whether Steve White was mistaken when he testified that Lonetta White wore a fur coat on the day she visited an attorney (whereas Caudill had said that Lonetta White was wearing a black leather coat)? (to which Caudill replied that she did not know if she or Steve White was mistaken); (c) whether Penny Hunter was mistaken when she testified that she was with Goforth all day in Paris, Kentucky, on the Saturday before the crimes (whereas Caudill had said that Goforth was at a crack house in Lexington that day)? (to which Caudill replied that one of them could be mistaken); (d) whether Cynthia Ellis had lied when she testified that Caudill told her that Caudill had hit Lonetta White with a clock? (to which Caudill replied that Ellis had lied); (e) whether Cynthia Ellis and Julia Davis had lied in their testimonies? (to which Caudill replied that some of the things they said were not true).

 In *Moss v. Commonwealth*, Ky., 949 S.W.2d 579 (1997), we held that a witness should not be required to characterize the testimony of another witness as a lie. *Id.* at 583; *see also Tamme*, 973 S.W.2d at 28. As in *Moss* and *Tamme*, Caudill did not object to any of these questions. As in *Moss* and *Tamme* (a death penalty case), we conclude that the totality of the circumstances are persuasive that exclusion of the improper inquiries would not have resulted in different verdicts in this case. *Sanders*, 801 S.W.2d at 668 (unpreserved error in death penalty case will not result in reversal unless the "circumstances in totality are persuasive that, minus the error, the defendant may not have been found guilty of a capital crime, or the death penalty may not have been imposed."); *Cosby v. Commonwealth*, Ky., 776 S.W.2d 367, 369 (1989), *overruled on other grounds by St. Clair v. Roark*, Ky., 10 S.W.3d 482, 487 (1999).

### 8. "America's Most Wanted."

 From March until November 1998, the police were searching for Caudill and Goforth and arranged to have the two and their crimes against Lonetta White featured on the popular television series, "America's Most Wanted." The trial judge made a pretrial ruling that this fact was irrelevant and should not be made

known to the jury. Nevertheless, when asked when he had last seen Caudill, Steve White responded that he had last seen her on "America's Most Wanted." The trial judge overruled Caudill's motion for a mistrial but offered to give the jury a curative admonition to disregard the remark. Caudill declined the offered admonition. This same issue arose in *Bray v. Commonwealth*, Ky., 68 S.W.3d 375 (2002), except that the evidence there was much more detailed than the isolated remark made here. *Id.* at 383. As in *Bray*, we conclude that admission of this evidence did not create a manifest necessity for a mistrial.

### 9. Caudill's racial slur.

During her March 15, 1998, statement, Detective Lyons told Caudill that he was only repeating what other people had told him. Caudill then remarked:

> You were talking to the junkies down the street, the crackheads, who were telling you something you wanted to hear, maybe for something that they had done, laying it on me. I know who you talked to out on the street. I know who you talked to. Jeanette and that other chick and and I know you talked to that n----- [racial slur] up the street. They're all sagers [phonetic], I know that.

■ Caudill asserts that the failure to delete the racial slur from her statement was reversible error. We disagree. The word came from her own mouth. She is a Caucasian accused of brutally murdering an African–American. Although it is obvious from the context that the slur did not refer to the victim, it is at least somewhat probative of an *animus* against African–Americans. The trial judge did not abuse his discretion in determining that its probative value was not substantially outweighed by its prejudicial effect. KRE 403; *Commonwealth v. English*, Ky., 993 S.W.2d 941, 945 (1999).

### 10. Caudill's demeanor.

■ Caudill asserts it was error to permit Julia Davis to testify that when Caudill told her that Lonetta White had said, "Help me, why are you doing this to me?" Caudill was laughing and using a mocking tone of voice. We disagree. A lay witness may express an opinion as to another's demeanor. KRE 701; *McKinney v. Commonwealth*, Ky., 60 S.W.3d 499, 503–04 (2001). The trial judge did not abuse his discretion in determining that the probative value of this evidence was not substantially outweighed by its prejudicial effect. KRE 403; *English*, at 945.

### 11. Cross-examination of Goforth.

■ After Goforth testified that he fled Kentucky because he did not have $5,000.00 to pay an attorney, the prosecutor inquired about Goforth's knowledge of the legal system, specifically whether he had taken a paralegal course before these crimes were committed. Goforth claims that this was prejudicial error because he was in prison when he worked as a paralegal. However, the Commonwealth only established *when*, not *where*, the paralegal training occurred for the purpose of establishing his legal knowledge at the time he fled Kentucky.

■ Goforth also complains that the prosecutor repeatedly pointed out that he had lied in the statement he gave to the police in Gulfport, Mississippi. "[W]hen [a defendant] assumes the role of a witness, the rules that generally apply to other witnesses—rules that serve the truth-seeking function of the trial—are generally applicable to him as well." *Portuondo v. Agard*, 529 U.S. 61, 69, 120 S.Ct. 1119, 1125, 146 L.Ed.2d 47 (2000) (*quoting Perry v. Leeke*, 488 U.S. 272, 282, 109 S.Ct. 594, 600–01, 102 L.Ed.2d 624 (1989)). A defendant's "credibility may be impeached and his testimony assailed like that of any other witness." *Id.* (*quoting Brown v. United States*, 356 U.S. 148, 154, 78 S.Ct. 622, 626,

2 L.Ed.2d 589 (1958)). "It is essential ... to the proper functioning of the adversary system that when a defendant takes the stand, the government be permitted proper and effective cross-examination in an attempt to elicit the truth." *United States v. Havens,* 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980).

### 12. Alleged violation of KRE 609.

During the direct examinations of Steve White, Edna Sharp, Cynthia Ellis, and Julia Davis, the prosecutor asked the witnesses whether they had been convicted of felonies and, upon receiving affirmative answers, the nature of the felonies committed which were, respectively, DUI-fourth offense, trafficking in cocaine, theft by deception of $300 or more, and forgery. Neither appellants nor any of the witnesses in question objected to these inquiries. Goforth now asserts that eliciting the nature of the convictions amounted to improper impeachment in violation of KRE 609(a) and that he was prejudiced thereby because the witnesses all inculpated Caudill, thus were favorable to him.

In fact, the inquiries had the effect of casting the witnesses in a more favorable light. The only purpose for inquiring whether a party's own witness has been convicted of a felony is to defuse anticipated impeachment by the opposing party; and the obvious purpose for inquiring as to the nature of each offense was anticipatory rehabilitation, *i.e.,* to show that the witnesses had, at least, not been convicted of a crime of violence. Furthermore, KRE 609(a) only provides that "[t]he identity of the crime upon which the conviction was based may not be disclosed *upon cross-examination* ..." (emphasis added), and these disclosures were elicited upon direct examination.

### 13. Hearsay.

Goforth raises six hearsay issues with respect to the testimonies of Caudill, Cynthia Ellis, and Julia Davis. Ellis and Davis were jailhouse informants who testified as witnesses for the Commonwealth against Caudill. Neither indicated any acquaintanceship with Goforth. Both had been cautioned prior to trial and pursuant to *Gray v. Maryland* and *Richardson v. Marsh,* both *supra,* not to testify as to any statements by Caudill indicating that anyone else was present when the crimes were committed. For the most part, both complied with this directive.

a. Goforth's first claim relates to Ellis's testimony that Caudill told her "that she had gathered some black, she did say black plastic bags, and that *they* had, that *she* had wrapped the woman in this." (Emphasis added.) In the first place, Ellis immediately corrected herself by changing the identifying pronoun from plural to singular. Secondly, Goforth admitted he was present when the victim's body was wrapped in a carpet and that he assisted in carrying it to the garage and loading it into the trunk of the victim's automobile. There was no objection to Ellis's slip and the totality of the circumstances are persuasive that it did not change the result in this case. *Sanders, supra,* at 668; *Cosby, supra,* at 369.

b. When the prosecutor asked Davis what Caudill had told her about what she had done, Davis replied: "I can't say the other person's name ...." Technically, this statement was not hearsay because it was not offered to prove the truth of any relevant fact. At worst, it was a *Bruton* violation and was rendered harmless when (1) Caudill subsequently testified and subjected herself to cross-examination and (2) Goforth subsequently testified and admitted that he was present when the crimes were committed.

c. On cross-examination by Caudill's attorney, Davis responded to an inquiry about her alleged inconsistent state-

ments to Detective Lyons by saying, "[i]t was all in the process of *them* murdering her, so, you know, it was as if she was being killed." (Emphasis added.) There was no objection to Davis's slip and, because Caudill subsequently testified that Goforth killed White and was subjected to extensive cross-examination on the subject, we are unpersuaded that, absent this isolated slip, the result would have been different. *Sanders; Cosby.*

 d. Caudill admitted on cross-examination by the prosecutor that the victim had pleaded with her to "please help me." The statement was not introduced to prove the truth of the matter asserted, KRE 801(c), but to prove that the victim was still alive when the statement was made. Because it had a relevancy without regard to the truth of the assertion, the statement was admissible. *Osborne v. Commonwealth,* Ky., 43 S.W.3d 234, 242 (2001); Robert G. Lawson, *The Kentucky Evidence Law Handbook* § 8.05, at 367–68 (3d ed. Michie 1993).

 e. Caudill testified that when she and Goforth returned to Lexington after burning Mrs. White's automobile, they encountered Sonny Price who asked Goforth, "Now where did you get, where did all the blood come from?" To the extent that Price's inquiry can be characterized as hearsay, it falls within the exception for a present sense impression, *i.e.,* "a statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." KRE 803(1); *Bray v. Commonwealth,* 68 S.W.3d at 381. Regardless, Goforth admitted that he assisted in carrying the victim's body to the garage and that the victim's blood had spilled through the carpet during that process, thus explaining the presence of the blood.

 f. After her arrest, Caudill accompanied the police on a walk-through of the crime scene, explaining how Goforth killed Mrs. White. As noted earlier in Part I, issue 4(b), the videotape was not introduced. KRE 801A(a)(2); *Fields v. Commonwealth,* Ky.,12 S.W.3d 275, 280–81 (2000). Goforth complains, however, that Caudill testified at trial that, after her arrest, she "did a walk-through reenactment with the detectives." That testimony, of course, was not hearsay. Goforth then complains that Detective Lyons testified that he "took Caudill out to the location on Bryanwood Park" (Mrs. White's residence). That, testimony, of course, also was not hearsay. Finally, Goforth complains that Detective Lyons testified that Caudill showed him "where Goforth's truck had been parked in the shopping center parking lot" (supporting Caudill's version that she did not want White to know she was with another person), whereas Goforth subsequently testified that his truck was parked directly in front of White's residence (supporting Goforth's version that Caudill told White they were having car trouble). Although Caudill may or may not have said to Lyons that "we parked the truck here so that White would not know that another person was with me," Lyons's testimony was arguably hearsay by implied assertion. *See* Lawson, *supra,* § 8.05 III(1), at 369. However, Goforth did not object to the testimony and we are unpersuaded that the result in this case would have been different absent the admission of the implied assertion. *Sanders, supra,* at 668; *Cosby, supra,* at 369. That is especially true since Caudill subsequently testified to the same fact under oath and subject to cross-examination.

### 14. *Effects of cocaine.*

 Goforth complains of the fact that, during cross-examination of Steve White, Caudill's attorney elicited information that using cocaine caused White to "become paranoid." Presumably, Caudill was hop-

ing by the inquiry to establish an intoxication defense. Goforth did not object to this testimony and does not articulate any rational reason how this testimony prejudiced him. He only speculates that the jury may have viewed this evidence as giving credence to Dr. Schilling's penalty phase testimony that Caudill was a submissive person. Dr. Schilling did not testify that Caudill was paranoid or that paranoia is in any way related to submissiveness.

## IV. GUILT PHASE INSTRUCTIONS.

Appellants complain only of the guilt phase instructions on homicide. The jury was not instructed on any lesser included homicide offenses.

### 1. Principal or Accomplice.

The murder instructions permitted the jury to find each appellant guilty of (1) murder under Instruction No. 2, which fully set out the elements of that offense, including the element of intent, (2) complicity to murder under Instruction No. 3, which fully set out the elements of that offense, including that the accomplice intended that the victim would be killed, or, (3) if the jury could not determine who was the principal and who was the accomplice, "murder—principal or accomplice" under Instruction No. 4. The last instruction read as follows:

### MURDER—PRINCIPAL OR ACCOMPLICE

If you believe from the evidence beyond a reasonable doubt that the defendant is guilty of either murder under Instruction No. 2 or complicity to murder under Instruction No. 3, but are unable to determine from the evidence whether the defendant committed this crime as principal under Instruction No. 2 or accomplice under Instruction No. 3, then you will find the defendant guilty of murder, principal or accomplice, under

this Instruction and so state in your verdict.

Both appellants were convicted of "murder—principal or accomplice," under Instruction No. 4. Both assert that their convictions are invalid because (1) the instruction did not set out the elements of the offenses of murder and complicity to murder; (2) the instruction authorized a non-unanimous verdict; (3) the instruction negated their right to an impartial jury; and (4) the instruction denied them individualized sentencing. We previously addressed and rejected the first two contentions in *Halvorsen v. Commonwealth*, Ky., 730 S.W.2d 921 (1986), and specifically approved an instruction identical to the one given in this case. *Id.* at 925. As noted in *Halvorsen*, there was no need to repeat the elements of murder and complicity to murder because they were fully set forth in Instructions Nos. 2 and 3. *Id.* The "combination" instruction specifically referred to those instructions and incorporated them by reference. *Id.* The unanimity requirement was not violated because both theories were supported by the evidence. *Id.; see Ice v. Commonwealth*, Ky., 667 S.W.2d 671, 677 (1984); *Wells v. Commonwealth*, Ky., 561 S.W.2d 85, 88 (1978).

While we, of course, agree that the appellants were entitled to a trial by an impartial jury, they do not explain how the "combination" instruction denied them that right. The cases they cite to support that proposition, *viz: Apodaca v. Oregon*, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972), *Williams v. Florida*, 399 U.S. 78, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970), and *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968), are all inapposite. In fact, *Apodaca* specifically holds that the Sixth Amendment does not require a unanimous verdict in a state criminal trial. 406 U.S. at 407, 92 S.Ct. at 1630.

Nor did the finding of guilt under the "combination" instruction deny either appellant the right to individualized sentencing. An accomplice to a murder committed by another in the course of the commission of a violent felony can be sentenced to death if the accomplice was a major participant in the commission of the felony and possessed a *mens rea* of at least reckless disregard for human life. *Tison v. Arizona*, 481 U.S. 137, 157–58, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987). Here, the accomplice instruction (and, hence, also the "combination" instruction) required the accomplice to actually intend that Mrs. White be killed. Despite that, each set of penalty phase instructions permitted the jury to consider as a possible mitigating circumstance that "[t]he Defendant was an accomplice in an offense committed by another person and [his][her] participation in the offense was relatively minor." KRS 532.025(2)(b)(5).

*Tison, supra,* by necessity, also resolves adversely to appellants their claims that they were not eligible for the death penalty because the jury did not specifically determine whether each was a principal or an accomplice in the commission of the offense.

### 2. *Murder—absence of EED.*

Caudill asserts that, because KRS 507.020(1)(a) contains the proviso that "a person shall not be guilty under this subsection if he acted under the influence of extreme emotional disturbance ..," it was error not to include the absence of extreme emotional disturbance (EED) as an element of the offense in the murder instruction. However, we have long held that "[a]n instruction on murder need not require the jury to find that the defendant was not acting under the influence of extreme emotional disturbance unless there is something in the evidence to suggest that he was, thereby affording room for reasonable doubt in that respect." *Gall v.*

*Commonwealth,* Ky., 607 S.W.2d 97, 109 (1980), *overruled on other grounds by Payne v. Commonwealth,* Ky., 623 S.W.2d 867, 870 (1981). As will be discussed more fully *infra,* there was no evidence whatsoever that Caudill was acting under extreme emotional disturbance at the time Lonetta White was killed.

### 3. *First-degree manslaughter—EED.*

Caudill asserts error in the trial judge's failure to instruct the jury on manslaughter in the first degree under KRS 507.030(1)(b), *i.e.,* intentional homicide committed under the influence of EED, as a lesser included offense. She points to three "triggering events" as evidence of EED: (1) she was informed of the recent suicide of a former boyfriend, Thomas Garrett, on Thursday, March 12, 1998; (2) she argued with her present boyfriend, Steve White, about her resumption of drug use on either Friday, March 13, or Saturday, March 14; and (3) Lonetta White refused her demand for money immediately before the murder. Caudill has placed the cart before the horse. First, there must be evidence of the existence of an EED at the time the homicide was committed. It is only upon such proof that the requirement arises for proof that the EED was the result of adequate provocation, *i.e.,* a "triggering event," and that the EED remained uninterrupted from the provocation until the killing. *Fields v. Commonwealth,* Ky., 44 S.W.3d 355, 359 (2001).

We start with the definition of "extreme emotional disturbance," formulated in *McClellan v. Commonwealth,* Ky., 715 S.W.2d 464 (1986):

Extreme emotional disturbance is a temporary state of mind so enraged, inflamed, or disturbed as to overcome one's judgment, and to cause one to act uncontrollably from the impelling force of the extreme emotional disturbance

*rather than from evil or malicious purposes.* It is not a mental disease in itself, and an enraged, inflamed or disturbed emotional state does not constitute an extreme emotional disturbance *unless there is a reasonable explanation or excuse therefor,* the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under circumstances as [the] defendant believed them to be.

*Id.* at 468–69 (emphasis added.)

Caudill did not claim that she went to Mrs. White's residence under the influence of EED. She claimed she went there to induce White, under false pretenses, to give her money with which to satisfy her drug dependency. However, a drug dependency or the effects of substance abuse, standing alone, does not authorize instructions on EED and first-degree manslaughter. *Stopher,* 57 S.W.3d at 803; *Bowling v. Commonwealth,* Ky., 873 S.W.2d 175, 179 (1993); *Stanford,* 793 S.W.2d at 115. Nor does Caudill claim that she killed White because she was emotionally disturbed about the death of her former boyfriend, or even about her argument with her then-present boyfriend, Mrs. White's son. A closer factual question is created by her claim that she became extremely emotionally disturbed when White refused her demand for money. However, even viewing the circumstances from Caudill's drug dependent point of view, White's mere resistance to her demand for money was not "a reasonable explanation or excuse" for Caudill to become so enraged, inflamed or disturbed as to be entitled to the defense of EED. *Hodge,* 17 S.W.3d at 850 ("Mere resistance by the victim … does not … constitute a reasonable explanation or excuse for an emotional state so enraged, inflamed or disturbed as to cause the perpetrator to kill the victim.").

*4. First-degree manslaughter—intent to injure.*

Both Caudill and Goforth claim they were entitled to an instruction on manslaughter in the first degree under KRS 507.030(1)(a), *i.e.,* unintentional homicide committed with the intent to cause serious physical injury but not death. However, an instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that the defendant is guilty of the lesser offense. *Parker v. Commonwealth,* Ky., 952 S.W.2d 209, 211 (1997). The postmortem examination of Mrs. White's body revealed that she suffered at least fifteen blows to the head with a hammer-like object. The blows ranged from those that caused lacerations to those that fractured the skull causing fragments of bone to be driven into the brain. This undisputed evidence precludes any reasonable doubt that whoever attacked Mrs. White intended to kill, as opposed to merely injure, her.

*5. Second-degree manslaughter—"felony murder."*

Caudill asserts that she was entitled to an instruction on manslaughter in the second degree because the jury could have believed that her complicity in the plan to rob White amounted only to wantonness, *i.e.,* awareness and conscious disregard of a substantial risk that Goforth would kill White during the course of the robbery. KRS 507.040(1); KRS 501.020(3).

Formerly, an accomplice to a dangerous felony could be convicted of an intentional murder committed by another participant in the felony on the theory that the intent to commit the dangerous felony provided the element of intent necessary

to convict of murder. This "felony murder" concept was abandoned in Kentucky with the adoption of the penal code. However, participation in a dangerous felony, *e.g.*, armed robbery, may supply the element of aggravated wantonness, *i.e.*, extreme indifference to human life, necessary to convict of wanton murder. KRS 507.020(1)(b). *See Graves v. Commonwealth*, Ky., 17 S.W.3d 858, 862–63 (2000); *Bennett v. Commonwealth*, Ky., 978 S.W.2d 322, 327 (1998); *Kruse v. Commonwealth*, Ky., 704 S.W.2d 192, 193–95 (1985). In that scenario, second-degree manslaughter becomes a lesser included offense of wanton murder if the jury could believe that the defendant's participation in the dangerous felony amounted to wantonness but not extreme indifference to human life. *Kruse*, at 194 (quoting the Commentary to KRS 507.020).

"Although a trial judge has a duty to prepare and give instructions on the whole law of the case, including any lesser included offenses which are supported by the evidence, . . . that duty does not require an instruction on a theory with no evidentiary foundation." *Gabow*, 34 S.W.3d at 72 (*quoting Houston v. Commonwealth*, Ky., 975 S.W.2d 925, 929 (1998)); *see also Thompkins v. Commonwealth*, Ky., 54 S.W.3d 147, 151 (2001). Caudill's version of the events was that she went to White's residence to ask for money and that White was in the process of complying with her request when Goforth unexpectedly attacked and killed her. Goforth's version was that Caudill killed White when White refused her request for money. Julia Davis testified that Caudill told her that she (Caudill) killed White. Cynthia Ellis testified that Caudill told her that she was the first to attack White by hitting her twice in the head with a clock. None of these versions support a theory that Caudill intended to rob White and that, during the course of the robbery, Goforth unexpectedly killed her. An inference can be drawn from Jeanette Holden's testimony that Caudill was looking for an accomplice who was willing to rob and "hurt" White. However, evidence that Caudill expected White to be "hurt" during the robbery would have warranted, at best, an instruction on aggravated wantonness, *i.e.*, wanton murder, which was not requested, not an instruction on mere wantonness, *i.e.*, second-degree manslaughter.

*6. Second-degree manslaughter—intoxication.*

 Both appellants assert they were entitled to an instruction on manslaughter in the second degree because the jury could have believed that they were so intoxicated that they could not form the requisite intent necessary for a conviction of murder. The defense of voluntary intoxication does not warrant an acquittal but reduces the offense from murder to second-degree manslaughter. *Slaven v. Commonwealth*, Ky., 962 S.W.2d 845, 856–57 (1997). However, "[i]n order to justify an instruction on [voluntary] intoxication, there must be evidence not only that the defendant was drunk, but that she was so drunk that she did not know what she was doing." *Springer v. Commonwealth*, Ky., 998 S.W.2d 439, 451 (1999); *see also Stanford*, 793 S.W.2d at 117–18. No evidence was introduced at trial to support a defense of intoxication. Goforth specifically testified that he was not claiming that he was intoxicated by drugs or alcohol and did not request an instruction on intoxication. Caudill testified that she and Goforth parked Goforth's truck in a shopping center parking lot so that White would not suspect there was another person with her. Goforth testified that Caudill gained entry into White's residence under the pretext that she needed to use the telephone because they were having car trouble. These are not the actions of a person who

was so intoxicated that she did not know what she was doing.

### 7. *Criminal facilitation.*

■ Both appellants assert they were entitled to an instruction on criminal facilitation of murder. KRS 506.080 provides:

> A person is guilty of criminal facilitation when, *acting with knowledge* that another person is committing or intends to commit a crime, he engages in conduct which *knowingly provides* such person with the *means or opportunity* for the commission of the crime and which in fact aids such person to commit the crime. [Emphasis added.]

Both appellants affirmatively asserted at trial that they had no knowledge that the other intended to murder Mrs. White. Without knowledge, there can be no facilitation. However, as noted in *Chumbler v. Commonwealth*, Ky., 905 S.W.2d 488 (1995), without knowledge there also could be no complicity. *Id.* at 498–99. Nevertheless, "[f]acilitation reflects the mental state of one who is 'wholly indifferent' to the actual completion of the crime," *Perdue v. Commonwealth*, Ky., 916 S.W.2d 148, 160 (1995), as opposed to one who intends that the crime be committed. *Young v. Commonwealth*, Ky., 50 S.W.3d 148, 165 (2001).

Caudill does not articulate how she "facilitated" Goforth's murder of White. But if the basis for her claim is that she induced White to unlock her door knowing that Goforth intended to kill her, no reasonable jury could believe she was "wholly indifferent" to the actual completion of the murder. Goforth claims he only "facilitated" Caudill's murder of White by furnishing Caudill with transportation to White's residence. *Webb v. Commonwealth*, Ky., 904 S.W.2d 226, 228–29 (1995). He would have a better argument if he had left Caudill at White's residence and returned to the crack house without her, or, perhaps, if he had waited in the pickup truck while Caudill entered the residence and committed the murder. However, no reasonable juror could believe that Goforth was "wholly indifferent" to the completion of the murder after he admitted that he accompanied Caudill to White's door, participated in the "car trouble" ruse that induced White to permit Caudill to enter her residence, and entered the residence with Caudill, all the while knowing that Caudill intended to enter the residence for the purpose of killing White.

## V. PENALTY PHASE ISSUES.

### 1. *Severance.*

■ Goforth asserts that the trial judge should have, *sua sponte,* severed his penalty phase from Caudill's penalty phase because Caudill introduced evidence in mitigation of capital punishment that she had a submissive personality. The jury was ultimately instructed to consider on Caudill's behalf the statutory mitigating circumstance, if believed to be true, that she "acted under duress or under the domination of another person even though the duress or domination of another person [was] not sufficient to constitute a defense to the crime." KRS 532.025(2)(b)(6). Goforth relies on *Foster v. Commonwealth*, Ky., 827 S.W.2d 670 (1992), for the proposition that the evidence and instruction were prejudicial to him because they portrayed him as the more culpable of the two. *Id.* at 679–83.

In *Foster*, the codefendant Powell introduced in support of her mitigation claim of duress and domination numerous witnesses who testified to specific acts of prior misconduct by Foster, including Foster's threats against Powell and her statements that she had to kill one of the victims because Powell was a "weak bitch" and "not capable of finishing the work." *Id.* at 681. Powell and Foster had a long-term lesbian relationship and

Powell, herself, testified that she had been beaten by Foster and that Foster had perpetrated other acts of violence against members of her own family. *Id.* Powell also introduced expert testimony that she suffered from the equivalent of "battered spouse syndrome" because she had "learned helplessness" toward Foster. *Id.* at 683. The upshot was that the jury fixed Foster's penalty at death and Powell's at life without parole for twenty-five years. *Id.* at 672. On appeal, the cumulation of Powell's mitigation evidence was held to have been so prejudicial to Foster as to require reversal of Foster's sentences for a new sentencing hearing. *Id.* at 683.

Here, Caudill did not testify in the penalty phase and offered no evidence of any prior misconduct by Goforth. When she testified in the guilt phase, Caudill did not claim that she was dominated by Goforth (a person she barely knew) or that Goforth induced her by threats or otherwise to participate in the murder of White. Remember, her version of the murder was that Goforth acted unexpectedly and unilaterally and bound her hands while he murdered White and ransacked her residence. In support of the duress and domination mitigator, Caudill offered witnesses who testified that she had been physically abused by her father and several husbands and that her lifestyle included drug addiction and prostitution. She also offered the expert testimony of Dr. Peter Schilling, a psychologist, that her history indicated possible brain damage from a prior head injury, and that her history and MMPI–2 test results reflected a submissive personality, "particularly with respect to men." To rebut Dr. Schilling's testimony, the Commonwealth presented the testimony of Dr. Andrew Cooley, a psychiatrist, who testified that he had examined and tested Caudill on the Friday and Saturday before trial and found no evidence of either brain damage or a dependent personality disorder.

At a bench conference prior to Dr. Schilling's testimony, Goforth's attorney made a motion to prohibit Schilling from testifying that Caudill was a person who would be unable to act as a principal in the commission of a murder, indicating that counsel was aware of the nature of Dr. Schilling's expected testimony. The motion was granted. Goforth's attorney did not request a severance of the penalty phase either before or after Dr. Schilling's testimony. He did not cross-examine either Dr. Schilling or Dr. Cooley. Nor did he request a recess in order to prepare a possible cross-examination. The enduring impression of this entire issue is that Goforth's attorney did not believe Dr. Schilling's testimony was sufficiently prejudicial to his client to warrant a severance or even cross-examination. We agree and hold that the trial judge did not err in failing to grant an unrequested severance. We also note in passing that, unlike the codefendants in *Foster*, both Caudill and Goforth received identical penalties for every offense.

### 2. Psychological/psychiatric reports.

 On June 4, 1999, a discovery order was entered requiring the Commonwealth to furnish Goforth with "all results or reports of mental and physical examinations ... including, but not limited to, ... any psychological/psychiatric tests of Johnathon Wayne Goforth or Virginia Caudill in the possession of the Commonwealth." Goforth's appellate counsel claims that his trial counsel never received Dr. Schilling's report and that the Commonwealth's failure to furnish that report after receiving it from Caudill's attorney impaired Goforth's trial counsel's right of cross-examination. This, however, is a claim Goforth's trial counsel never made. During the lengthy discussion at the pretrial hearing held on

January 27, 2000, concerning time frames for obtaining mental health examinations and furnishing reports of experts, Goforth's counsel indicated that he was not interested in reports of mental health examinations of Caudill. Nevertheless, his motion to limit Dr. Schilling's testimony indicates that he had advance notice of the nature of Dr. Schilling's proposed testimony.

 KRS 504.070(1) requires a defendant to give the prosecution twenty days notice of an intention to introduce mental health evidence at trial, and KRS 504.070(2) gives the prosecution the right to have the defendant examined by an independent mental health expert. However, KRS 504.070(4) requires the prosecution to file any "reports prepared by its witnesses" ten days prior to trial. Dr. Schilling testified that he examined and tested Caudill four times over the period November 4, 1999, through January 13, 2000. On January 18, 2000, exactly twenty days before trial, Caudill filed her notice of intent to introduce evidence of "mental illness, retardation or deficiency." The Commonwealth was unable to schedule Caudill's examination by Dr. Cooley until February 4—5, 2000, the Friday and Saturday before the trial began on February 7, 2000. Both appellants complain that they never received a final report of Dr. Cooley's examination. In fact, it appears that Dr. Cooley never prepared a final report. Caudill's counsel admitted receiving Dr. Cooley's "preliminary report" prior to Dr. Cooley's testimony. Goforth's trial counsel did not raise the issue at all, no doubt because Dr. Cooley's testimony did not prejudice Goforth in any respect. Finally, since neither doctor's report is in the record, we are unable to determine whether either appellant was prejudiced by the failure, if any, to timely receive it. *Garrett v. Commonwealth*, Ky., 48 S.W.3d 6, 15 (2001) (affirming where disputed document not introduced by avowal); *Commonwealth v. Ferrell*, Ky., 17 S.W.3d 520 (2000).

*3. Exclusion of allegedly mitigating evidence.*

 Appellants claim it was error for the trial court to refuse their proffer, as mitigation evidence, of the fact that a defendant in another case who had been convicted of multiple murders had been sentenced by agreement to life without parole. However, the requirement of individualized sentencing requires an assessment of the particular defendant's background and character and the nature of the crime for which he or she has been convicted. *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 2947, 106 L.Ed.2d 256 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). As a corollary to that rule, evidence not bearing on the defendant's character, background, or the circumstances of the offense for which he/she has been convicted may be excluded. *Smith v. Commonwealth*, Ky., 845 S.W.2d 534, 539 (1993) (*quoting Lockett v. Ohio*, 438 U.S. 586, 604 n. 12, 98 S.Ct. 2954, 2965 n. 12, 57 L.Ed.2d 973 (1978)). Specifically, evidence of a sentence imposed upon someone else, whether pursuant to plea agreement or jury verdict, is not a factor to be considered by the jury or the sentencing judge in determining the appropriate penalty for this defendant. *Commonwealth v. Bass*, Ky., 777 S.W.2d 233, 234 (1989); *McClellan*, 715 S.W.2d at 472.

*4. Goforth's prior criminal convictions.*

KRS 532.025(1)(a) provides, *inter alia*:

In such hearing, the judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or

pleas of nolo contendere of the defendant, or the absence of any prior conviction and pleas; provided, however, that only such evidence in aggravation as the state has made known to the defendant prior to his trial shall be admissible. KRS 532.025(1)(b), which provides for capital sentencing by a jury, incorporates this provision by reference.

 During the penalty phase of this trial, the prosecutor introduced evidence of two prior criminal convictions of Goforth: (1) a conviction of trafficking in a controlled substance in the third degree, and (2) a conviction of three counts of criminal facilitation of robbery in the first degree. Goforth's appellate counsel asserts entitlement to a new penalty phase because there is no proof in the record that the Commonwealth gave Goforth's trial counsel pretrial notice of an intent to introduce these two prior convictions. However, there is also no proof that the Commonwealth did not give such notice. In fact, prior to the commencement of the penalty phase, Goforth's trial counsel inquired as to the procedure the prosecutor intended to use to introduce Goforth's prior convictions. After the prosecutor recited verbatim what he intended to tell the jury, Goforth's counsel stated he had no objection. At no time did he complain that he had not been given pretrial notice of the Commonwealth's intent to introduce those convictions.

### 5. Instruction issues.

#### a. EED mitigator.

The trial judge instructed the jury with respect to Caudill to consider, if believed to be true, the mitigating circumstance set forth in KRS 532.025(2)(b)(2), *viz:* "The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance even though the influence of extreme mental or emotional disturbance is not sufficient to constitute a defense to the crime."

At trial, the *prosecutor* requested that the instruction be accompanied by the definition of EED set forth in *McClellan,* 715 S.W.2d at 468–69, quoted verbatim in Part IV, issue 3, *supra.* Caudill's trial counsel did not join in that request, no doubt because the *McClellan* definition serves to narrow, not broaden, the scope of EED. *Dean v. Commonwealth,* Ky., 777 S.W.2d 900, 910–11 (1989) (Leibson, J., concurring); *McClellan, supra,* at 473–74 (Leibson, J., dissenting). Caudill's appellate counsel, however, asserts that it was reversible error to omit the *McClellan* definition from the penalty phase instructions, relying on the plurality opinion in *Dean, supra,* at 909.

 Upon further reflection, we conclude that the *McClellan* definition of EED applies only to EED as a defense under KRS 507.020(1)(a) and not to EED as a mitigating circumstance under KRS 532.025(2)(b)(2). The language in the latter statute differs somewhat from the former, primarily in that the murder statute requires that there be a reasonable explanation or excuse for the EED, whereas the mitigation statute does not contain that qualification. Yet, the qualification is included in the *McClellan* definition. *McClellan, supra,* at 468–69. If the *McClellan* definition applied to both statutes, evidence justifying an instruction on EED as a mitigator would have to be equally as strong as evidence justifying an instruction on EED as a defense. If so, the omission of the *McClellan* definition from Caudill's penalty phase instructions would be harmless beyond a reasonable doubt, because, if the evidence was insufficient to entitle Caudill to an EED guilt phase instruction, it was equally insufficient to entitle her to an EED mitigation instruction. However, the phrase, "even though the influence of extreme mental or emotional disturbance is not sufficient to

constitute a defense to the crime," in KRS 532.025(2)(b)(2) clearly anticipates that a broader form of emotional disturbance is available as mitigation of punishment than as a defense to the crime. Thus, even though, as here, the evidence is insufficient to warrant an instruction on EED as a defense to the crime, it could still be sufficient to warrant an instruction on EED as a mitigating circumstance.[2] Therefore, the *McClellan* definition does not apply to EED as a mitigating circumstance and the trial judge properly denied the prosecutor's motion to include the definition in the penalty phase instructions. To the extent that *Dean* holds otherwise, it is overruled.[3]

### b. Accomplice mitigator.

 The trial judge instructed the jury with respect to both appellants to consider, if believed to be true, the mitigating circumstance described in KRS 532.025(2)(b)(5), *viz:* "The defendant was an accomplice in a capital offense committed by another person and [his][her] participation in the capital offense was relatively minor." Both appellants assert error in the trial judge's refusal to delete the language, "and [his][her] participation in the capital offense was relatively minor." We disagree. To delete the language in question would completely change the meaning and intent of this statutory mitigating circumstance. Obviously, major participation by an accomplice in a capital offense is not a mitigating circumstance. *Tison v. Arizona*, 481 U.S. at 157–58, 107 S.Ct. at 1688.

### c. Other instruction issues.

 There is no requirement that a capital penalty jury be instructed that its findings on mitigation need not be unanimous. *Mills v. Commonwealth*, Ky., 996 S.W.2d 473, 492 (1999); *Tamme*, 973 S.W.2d at 37; *Bowling*, 873 S.W.2d at 180. There was no need to instruct the jury that it could impose a life sentence even if it found an aggravating factor beyond a reasonable doubt. *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111, 113 (1994). Instruction No. 19, "Authorized Sentences," read together with the verdict forms and as further explained during closing arguments, adequately apprised the jury of the available range of penalties and the role of the aggravator in the sentencing scheme. "An instruction may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record." *Estelle v. McGuire*, 502 U.S. 62, 72, 112 S.Ct. 475, 482, 116 L.Ed.2d 385 (1991) (internal quotations omitted). Finally, as we have stated many times, while we prefer the specimen verdict forms at 1 Coo-

**2.** The "even though" phrase in the statute pertains to the availability of the mitigator, *i.e.,* the sufficiency of the evidence to warrant an instruction, and should not be included in the jury instruction, itself.

**3.** In fact, since only a plurality of the Court agreed with *Dean*'s holding on this issue, it never acquired precedential status. *Fugate v. Commonwealth*, Ky., 62 S.W.3d 15, 19 (2001). Furthermore, while a change in judicial construction of a statute can implicate the Ex Post Facto Clause, U.S. Const., art. I, § 10, Ky. Const. § 19(1), *Bouie v. City of Columbia*, 378 U.S. 347, 354–55, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964), because the *McClellan* definition narrows the scope of EED, today's holding that the definition does not apply to EED as a mitigator is an ameliorative, as opposed to a more onerous, interpretation than in *Dean*. Thus, our decision has no *ex post facto* ramifications. *Dobbert v. Florida*, 432 U.S. 282, 294, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977) ("It is axiomatic that for a law to be ex post facto it must be more onerous than the prior law."); *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 391, 1 L.Ed. 648 (1798) (No law "that mollifies the rigor of the criminal law" is within the meaning of the Ex Post Facto Clause.); *cf. Martin v. Commonwealth*, Ky., 96 S.W.3d 38, 58–59 (2003) (judicial interpretation that narrows the scope of a criminal statute is ameliorative).

per, *Kentucky Instructions to Juries (Criminal)* § 12.10A (4th ed. Anderson 1999), over the specimen forms at § 12.10 of that treatise, we do not deem the use of the latter forms to be reversible error. *E.g., Hodge*, 17 S.W.3d at 854. We note that when the prosecutor suggested that the § 12.10A forms be used, the attorneys representing Caudill and Goforth advised they had no objection to the § 12.10 forms prepared by the trial judge.

## VI. ALLEGED PROSECUTORIAL MISCONDUCT.

Appellants cite numerous instances of alleged prosecutorial misconduct to which no objection was made at trial. All are without merit.

Any consideration on appeal of alleged prosecutorial misconduct must center on the overall fairness of the trial. In order to justify reversal, the misconduct of the prosecutor must be so serious as to render the entire trial fundamentally unfair.

*Stopher*, 57 S.W.3d at 805 (citations omitted).

■ Informing prospective jurors during voir dire that the court was looking for "neutral" jurors equated to a desire for "impartial" jurors and did not dilute the presumption of innocence or shift the burden of proof. The prosecutor did not excessively "humanize" the victim or overemphasize the brutality of the crime. *Hodge*, 17 S.W.3d at 852. Contrary to appellants' assertion, the prosecutor did not tell the jury during guilt phase closing argument that this was the worst crime he had ever seen. He told them, "As many times as I have stood here before jurors and in murder cases and I don't have the words." That statement did not interject extrajudicial information into the trial. In *Tamme, supra*, we held that the prosecutor's characterization of the case as the "worst imaginable crime" was but a state-ment of opinion of the prosecutor's view of the evidence. 973 S.W.2d at 39.

■ The prosecutor's guilt phase argument did not invoke the "golden rule." The allegedly offensive remarks were:

What must she have been thinking that night, this seventy-three-year-old woman, by herself, basically afraid anyway? What panic she must have felt confronted by this woman and this stranger at three o'clock in the morning.

■ A "golden rule" argument is one in which the prosecutor asks the jurors to imagine themselves or someone they care about in the position of the crime victim. *Black's Law Dictionary* 700 (7th ed. West 1999). *E.g.,* "Suppose you run a store and somebody comes in on you and does that to you. What's it worth?" *Lycans v. Commonwealth*, Ky., 562 S.W.2d 303, 305–06 (1978). *See also Lucas v. State*, 335 So.2d 566, 567 (Fla.Ct.App.1976) ("Think how you ladies would feel if that happened to you.").

■ The prosecutor's statement that "just because there is a question or some unanswered part of the case, that there is automatically reasonable doubt" did not impermissibly define "reasonable doubt." *Commonwealth v. Callahan*, Ky., 675 S.W.2d 391, 393 (1984). *Callahan* also contains the disclaimer that "[w]e do not intend by this holding that counsel cannot point out to the jury which evidence, or lack thereof, creates reasonable doubt." *Id.* at 393. In *Sanders v. Commonwealth, supra*, we declined to reverse where the prosecutor told the jury that "beyond a reasonable doubt" does not mean "beyond all doubt or a shadow of a doubt." 801 S.W.2d at 671. As in *Sanders*, "we are wholly unconvinced, considering the circumstances, that absent this putative error the [appellants] may not have been found

guilty of a capital crime, or the death penalty may not have been imposed." *Id.*

 The prosecutor's guilt phase argument that neither defendant did, showed, or demonstrated anything "that says they're not guilty of this offense" was fair comment on the quality of the evidence for the defense. *Tamme,* 973 S.W.2d at 38; *Bowling,* 873 S.W.2d at 178; *Haynes v. Commonwealth,* Ky., 657 S.W.2d 948, 952–53 (1983).

 The prosecutor's penalty phase argument that "you have already found the aggravating circumstances" was fair comment on the jury's guilt phase verdicts. The two aggravating circumstances were that the murder was committed during the course of a robbery in the first degree and/or a burglary in the first degree and the jury had, indeed, found appellants guilty of those offenses. The factual issue remaining with respect to the finding of an aggravating circumstance was whether the murder was committed while appellants were engaged in the commission of either of those offenses. KRS 532.025(2)(a). The prosecutor argued that it was; defense counsel argued that it was not.

 Caudill claims the prosecutor misstated the law with respect to the mitigating factor of intoxication. Voluntary intoxication is a defense to a criminal charge if it "[n]egatives the existence of an element of the offense." KRS 501.080(1). Our cases interpret that provision to mean that the defendant must have been so intoxicated as not to know what he or she was doing. *See* Part IV, issue 6, *supra.* However, voluntary intoxication is a mitigating circumstance with respect to capital punishment if it equates with the same

standard established for the defenses of involuntary intoxication, mental illness or retardation, and insanity, *i.e.,* if it impairs the defendant's capacity to appreciate the criminality of his/her conduct or to conform his/her conduct to the requirements of law. KRS 501.080(2); KRS 504.060(5); KRS 504.120(3); KRS 532.025(2)(b)(7).[4] In his argument, the prosecutor stated:

> That at the time of the offense the capacity of either defendant to conform their [sic] conduct to the requirements of the law was impaired as a result of intoxication. You listened to the evidence. . They knew exactly what they were doing when they were there. Were they under the influence to the extent that they didn't know what they were doing?

Thus, the prosecutor first stated the correct test, then referred to an incorrect standard in a rhetorical question. The trial judge's instruction contained the correct test and there was no objection to the rhetorical question. We are unpersuaded, considering the totality of the circumstances, that, absent this isolated reference, the death penalty may not have been imposed upon either Caudill or Goforth. *Sanders, supra,* at 668; *Cosby, supra,* at 369. *Compare Mattingly v. Commonwealth,* Ky.App., 878 S.W.2d 797, 800 (1993) (when the prosecutor twice misstated the test for insanity, *viz:* "The test is can she discriminate between right and wrong . . . . The question is whether or not she had the ability to discern right from wrong," the error, properly preserved by contemporaneous objections, was not harmless).

---

4. In fact, the applicable language in KRS 532.025(2)(b)(7) is "the capacity of the defendant to appreciate the criminality of his conduct to the requirements of law was impaired." This language makes no sense and

is an obvious typographical error that has existed in this statute since its enactment. 1976 Ky. Acts (ex. sess.), ch. 15, § 2(7). The trial judge's instructions conformed to the obviously intended meaning of the statute.

■ During his penalty phase argument, the prosecutor attributed to the late Justice Potter Stewart the remark that "if those who break the law do not receive the punishment that the public believes they deserve, therein are sown the seeds of anarchy." Even though Justice Stewart was misquoted,[5] we perceive no fundamental unfairness from this particular dramatic flourish. Nor did the remark diminish the jury's sentencing responsibility or shift that responsibility from the jury to Justice Stewart (which seems to be the gist of this aspect of the argument). Contrary to appellants' assertion, the reversal in *Clark v. Commonwealth*, Ky., 833 S.W.2d 793 (1992), was not due to the same prosecutor's identical remark. In *Clark*, the prosecutor more seriously misquoted Justice Stewart as saying that " 'the seeds of anarchy' are sown unless capital punishment is meted in deserving cases." *Id.* at 795. Nevertheless, the primary reason for reversal in *Clark* was that the prosecutor diminished the jury's sentencing responsibility by stating twenty-five times in his closing argument that the jury's verdict would be only a "recommendation." *Id.* at 796.

■ Finally, we perceive no fundamental unfairness in that portion of the prosecutor's penalty phase closing argument that evoked sympathy for the victim and members of her family. *Payne v. Tennessee*, 501 U.S. 808, 825, 111 S.Ct. 2597, 2608, 115 L.Ed.2d 720 (1991); *Hodge*, 17 S.W.3d at 852–53; *Bowling*, 942 S.W.2d at 303.

## VII. MISCELLANEOUS ISSUES.

*1. Sufficiency of the evidence.*

■ The evidence was sufficient to support appellants' convictions of each offense. *Commonwealth v. Benham*, Ky., 816 S.W.2d 186, 187 (1991). There was ample evidence that appellants unlawfully entered Mrs. White's residence, see Part III, issue 3, *supra*, for the purpose of committing a crime, that Mrs. White was murdered while appellants were in the building, and that appellants were armed with deadly weapons while in immediate flight therefrom. KRS 511.020(1); *Jackson v. Commonwealth*, Ky., 670 S.W.2d 828, 830 (1984) (one who steals a deadly weapon during the course of a burglary is "armed" within the meaning of the statute). It is immaterial to the robbery convictions that the theft may have occurred after the murder so long as the theft and murder were part of the same criminal episode. *Bowling*, 942 S.W.2d at 307. The evidence afforded a reasonable inference that appellants went to Mrs. White's residence for the purpose of committing robbery and that the murder was committed in facilitation of the robbery. Appellants admitted to tampering with physical evidence by attempting to destroy the victim's body and each testified that the other committed both the murder and arson.

*2. Double jeopardy.*

■ Convictions of both robbery and burglary do not violate the constitutional proscription against double jeopardy since each offense requires proof of an element that the other does not. *Jordan v. Commonwealth*, Ky., 703 S.W.2d 870, 873 (1985); *see Commonwealth v. Burge*, Ky., 947 S.W.2d 805, 809–11 (1997). Nor is it double jeopardy to convict a defendant of robbery or burglary and then use the

---

5. What Justice Stewart, in fact, wrote was: "When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they 'deserve,' then there are sown the seeds of anarchy of self-help, vigilante justice, and lynch law." *Furman v. Georgia*, 408 U.S. 238, 308, 92 S.Ct. 2726, 2761, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring).

same offense as an aggravating circumstance authorizing capital punishment. *Bowling,* 942 S.W.2d at 308; *Wilson v. Commonwealth,* Ky., 836 S.W.2d 872, 891 (1992), *overruled on other grounds by St. Clair v. Roark,* 10 S.W.3d at 487; *Sanders,* 801 S.W.2d at 682.

### 3. Trial judge's report.

At the conclusion of the sentencing hearing, the trial judge informed the attorneys that he had completed a preliminary draft of the report required by KRS 532.075(1) and that he would complete it in final form later that day and furnish copies to counsel for appropriate objections. The report was filed in the record later that same day. Appellants assert that because the report was at least partially prepared before the sentences were imposed, the trial judge must have prejudged the sentence. We disagree. As required by the statute, the report is in the form of a questionnaire. The only question that directly pertains to the imposition of the death penalty is question 12 of section E which requests "general comments of the trial judge concerning the appropriateness of the sentence imposed in this case." All of the other questions pertain to the facts of the case, the conduct of the trial, and the background(s) of the defendant(s). These are factors which a trial judge should consider before passing final sentence and the process of preparing the answers to those questions should assist a trial judge in reaching the ultimate decision. We have reviewed the videotape of the sentencing hearing, which consisted solely of legal arguments and pleas for mercy by counsel and apologies and statements of remorse by the appellants, and find no indication that the trial judge had predetermined the sentence before hearing these arguments, pleas, apologies, and statements of remorse.

### 4. Constitutionality of death penalty.

"[A]rguments that the death penalty is discriminatory and arbitrary, and that our statutory scheme does not provide constitutionally adequate guidance to capital sentencing juries, have been raised, considered and rejected by this Court on numerous occasions." *Hodge,* 17 S.W.3d at 854. "Our views with respect to those arguments remain unchanged." *Id.*

### 5. Constitutionality of proportionality review.

There is no constitutional right to a proportionality review. *Pulley v. Harris,* 465 U.S. 37, 44, 104 S.Ct. 871, 876, 79 L.Ed.2d 29 (1984). Our review is governed solely by the provisions of KRS 532.075.

### 6. KRS 532.075(6) data.

Failure to provide access to data compiled pursuant to KRS 532.075(6) does not implicate the Due Process Clause. *Mills,* 996 S.W.2d at 495; *Sanders,* 801 S.W.2d at 683; *Harper v. Commonwealth,* Ky., 694 S.W.2d 665, 671 (1985).

### 7. Constitutionality of death qualification of jurors.

Death qualification of jurors is not unconstitutional. *Hodge,* 17 S.W.3d at 838.

### 8. Trial judge's role in sentencing.

Appellants cite a statement in *Matthews v. Commonwealth,* Ky., 709 S.W.2d 414 (1985), that "the statutory scheme not only permits, but anticipates, that the trial court will play a separate and different role in sentencing in capital cases after the jury's verdict has been received." *Id.* at 423. From this statement they conclude that our capital sentencing scheme is fatally flawed because it does not articulate what that "separate and different" role might be. Of course, the quotation from *Matthews* is out of context. What we said in *Matthews* was that a trial judge, in sentencing a defendant convicted by a jury

that has also fixed a sentence, is not limited, as was the jury, to consideration of statutory aggravating and mitigating circumstances when exercising his/her discretion as to whether to accept the jury verdict or to impose a lesser sentence. The information elicited in the trial judge's report, KRS 532.075(1), can be a partial guide to assist the trial judge in making that decision.

*9. Residual doubt.*

Once again, we are cited to *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), for the proposition that the death penalty should be set aside because of the existence of a "residual doubt." *Lockhart* does not so hold and we specifically addressed and rejected that argument in *Tamme*, 973 S.W.2d at 40.

*10. Video record.*

"The Court's use of videotaped records pursuant to CR 98 instead of stenographic transcripts did not prejudice [the appellants'] right to appeal." *Hodge*, 17 S.W.3d at 854–55 (*citing Foster v. Kassulke*, 898 F.2d 1144, 1147–48 (6th Cir.1990)).

*11. Cumulative error.*

No cumulative error occurred that requires reversal of this case. *Compare Funk v. Commonwealth*, Ky., 842 S.W.2d 476, 483 (1992).

## VIII. PROPORTIONALITY REVIEW.

Pursuant to KRS 532.075(3), we have reviewed the record and determined that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. There was ample evidence to support the jury's finding of statutory aggravating circumstances. We have also reviewed all cases decided since 1970 in which the death penalty was imposed. We have particularly considered those cases in which the defendant was convicted of a single murder committed during the course of a burglary or robbery, or both, and sentenced to death, *viz: Mills v. Commonwealth*, Ky., 996 S.W.2d 473 (1999) (burglary and robbery); *Bowling v. Commonwealth*, Ky., 942 S.W.2d 293 (1997) (burglary and robbery); *Bussell v. Commonwealth*, Ky., 882 S.W.2d 111 (1994) (robbery); *Epperson v. Commonwealth*, Ky., 809 S.W.2d 835 (1990) (burglary and robbery); *Moore v. Commonwealth*, Ky., 771 S.W.2d 34 (1988) (robbery); *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407 (1987) (robbery); *Marlowe v. Commonwealth*, Ky., 709 S.W.2d 424 (1986) (robbery); *Kordenbrock v. Commonwealth*, Ky., 700 S.W.2d 384 (1985) (robbery); *McQueen v. Commonwealth*, Ky., 669 S.W.2d 519 (1984) (robbery); *Self v. Commonwealth*, Ky., 550 S.W.2d 509 (1977) (robbery); *Meadows v. Commonwealth*, Ky., 550 S.W.2d 511 (1977) (burglary); *Caine v. Commonwealth*, Ky., 491 S.W.2d 824 (1973) (robbery); *Galbreath v. Commonwealth*, Ky., 492 S.W.2d 882 (1973) (robbery); *Leigh v. Commonwealth*, Ky., 481 S.W.2d 75 (1972) (robbery). (The death sentences in *Self, Meadows, Caine, Galbreath,* and *Leigh* were all vacated pursuant to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).) Considering the facts of this case and comparing them to similar cases in which the death penalty was imposed, we conclude that the sentences of death imposed in this case are neither excessive nor disproportionate.

Accordingly, the judgments of conviction and sentences imposed by the Fayette Circuit Court are affirmed.

LAMBERT, C.J.; COOPER, GRAVES, JOHNSTONE, and WINTERSHEIMER, J.J., concur.

KELLER, J., concurs in the result by separate opinion, which STUMBO, J., joins.

KELLER, Justice, concurring.

I concur in the result reached by the majority and I would affirm the Fayette Circuit Court's judgments of conviction and sentence in these cases. I write separately, however, because I disagree with certain aspects with the majority's analysis, specifically: (1) Part II(2) ("Death Qualification Question"), in which the majority's dicta calls into question long-standing Kentucky precedent holding that a fair and impartial juror must be able to consider the full range of penalties provided for an offense; (2) Part II(6) ("*Batson* challenge"), in which the majority mischaracterizes Appellants' objection to the Commonwealth's exercise of peremptory challenges; (3) Part III(3) ("Character evidence"), in which today's majority becomes the first Kentucky court to hold in a published opinion that a person "unlawfully enters" another's residence if he or she gains entry to the residence through subterfuge; and Part V(5)(a) ("EED mitigator"), in which the majority dismisses this Court's previous, more-than-reasonable conclusion that "[w]hether extreme emotional disturbance is used as an element of the murder, manslaughter, *or mitigating circumstance instructions*, the jury should be instructed as to its definition."[1] Although I do not intend to dwell upon any of these topics at great length, I hope to clarify my views as to each of them.

As to Part II(2), I agree with the majority's conclusion that the trial court's "death penalty qualification" question did not deprive Appellants of their right to a meaningful voir dire examination because the trial court permitted Appellants' trial counsel to question jurors regarding their ability to consider the full range of penalties.[2] I take issue, however, with the "full court press" that the majority employs upon *Grooms v. Commonwealth,*[3] wherein this Court stated that "a juror should be excused for cause if he would be unable in any case, no matter how extenuating the circumstances may be, to consider the imposition of the minimum penalty prescribed by law."[4] Today's majority characterizes the *Grooms* court's conclusion as anomalous and mere dictum. Less than two years ago, however, this Court again stated "[w]e remain convinced that, in all criminal cases, the right to a fair and impartial jury requires the jury to possess the ability to consider *the full range of penalties* [.]"[5] Although the majority states, without citation of authority, that the Commonwealth of Kentucky stands alone in requiring the disqualification of a juror who cannot consider the minimum authorized sentence in a capital case, this contention, if true, is not a valid criticism of this Court's past attempts to ensure that such cases are tried before fair and impartial jurors, and it is certainly not a valid reason to abandon long-standing policy. If today's majority opinion is an indication that the Court intends to retreat

1. *Dean v. Commonwealth,* Ky., 777 S.W.2d 900, 909 (1989) (emphasis added).

2. I would observe, however, that the majority opinion erroneously suggests that the minimum sentence for a defendant convicted of both Murder and First–Degree Robbery, First–Degree Burglary, or First–Degree Rape is thirty (30) years. The majority's arithmetic ignores not only the context of counsel's question—i.e., what sentence the juror could consider *for the Murder*—but also the fact that the trial court could order sentences to run concurrently. KRS 532.110(1).

3. Ky., 756 S.W.2d 131 (1988).

4. *Id.* at 137.

5. *Lawson v. Commonwealth,* Ky., 53 S.W.3d 534, 541 (2001) (emphasis added).

from precedent that supports the common-sense notion that a fair and impartial juror must "be able to consider *any permissible* punishment" [6]—including *both* the maximum and the minimum sentences authorized by law—the Court will do so over my dissent.[7]

As to Part II(6), the majority misstates Appellants' objection. Appellants questioned the Commonwealth's use of eight of its nine peremptory challenges against *male* members of the jury panel—i.e., an objection premised on only the jurors' gender, not their race. Thus, regardless of the races of these eight jurors removed from the jury panel, Appellants made a prima facie case for discrimination on the basis of gender.[8] In any event, the trial court found that the Commonwealth elected to challenge the jurors for non-discriminatory reasons, and I agree with the majority that the trial court's finding in that regard is supported by substantial evidence.

In Part III(3), the majority concludes that the erroneous introduction of character evidence regarding the victim's careful nature was harmless beyond a reasonable doubt because "both appellants admitted at trial that they 'unlawfully entered' the victim's home." [9] Because the evidence at trial largely compelled the conclusion that Appellants were guilty of First–Degree Burglary under one or more theories, I agree with the majority's ultimate conclusion that this evidence did not prejudice Appellants. However, I cannot agree with the majority's holding that Appellant Goforth's version of the events—in which he and Appellant Caudill obtained admission into the victim's home by falsely representing to the victim that they needed to use her telephone—constituted "unlawful entry" as defined in Chapter 511 of the Kentucky Penal Code. KRS 511.090(1) provides that "[a] person 'enters or remains unlawfully' in or upon premises *when he is not privileged or licensed to do so.*" [10] And, the Commentary to KRS 511.020 explains that Kentucky's burglary crimes' "knowingly enter or remain unlawfully" requirement "is intended to ... emphasize[ ] the unlawfulness of the intrusion.... Burglary is not committed by ... invited guests who enter buildings under privilege even though they have intention to commit a crime while there." [11] In fact, in *Tribbett v. Commonwealth*,[12] where the appellant obtained entry into the victim's home ostensibly in order to make use of the victim's firing range,[13] but actually to

**6.** *Shields v. Commonwealth*, Ky., 812 S.W.2d 152, 153 (1991) (emphasis added), *overruled on other grounds by Lawson v. Commonwealth, supra* note 5. *See also Woodall v. Commonwealth*, Ky., 63 S.W.3d 104, 119 (2002) ("[A] juror is disqualified if he or she cannot consider the minimum penalty ...."), *cert. denied*, 537 U.S. 835, 123 S.Ct. 145, 154 L.Ed.2d 54 (2002); *Hodge v. Commonwealth*, Ky., 17 S.W.3d 824, 837 (1999), *cert. denied* 531 U.S. 1018, 121 S.Ct. 581, 148 L.Ed.2d 498 (2000).

**7.** *See Furnish v. Commonwealth*, Ky., 95 S.W.3d 34, 54–57 (2003) (Keller, J., dissenting); *Stopher v. Commonwealth*, Ky., 57 S.W.3d 787, 808–812 (2001) (Keller, J., dissenting), *cert. denied* 535 U.S. 1059, 122 S.Ct. 1921, 152 L.Ed.2d 829 (2002).

**8.** *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (holding that peremptory challenges cannot be exercised on the basis of gender). *Cf. Wiley v. Commonwealth*, Ky.App., 978 S.W.2d 333 (1998) (holding that *the defendant* could not exercise his peremptory challenges on the basis of gender).

**9.** *Majority Opinion*, 120 S.W.3d 635, 660 (2003).

**10.** KRS 511.090(1) (emphasis added).

**11.** KRS 511.090, Official Commentary (Banks/Baldwin 1974).

**12.** Ky., 561 S.W.2d 662 (1978).

**13.** *See Walker v. Commonwealth*, Ky., 561 S.W.2d 656, 657 (1978).

682

rob and murder the victim, the Court made no mention of today's majority opinion's "subterfuge" theory and, in fact, held that "Tribbett and his two companions were invited by [the victim] into his home. As such, *they were* mere *licensees.*"[14] Today's majority opinion thus unnecessarily embraces a new theory of "unlawful entry" burglary that appears inconsistent with both the commentary to KRS 511.020 and our case law interpreting it.

As to Part V(5)(a), I agree with the *Dean* plurality that EED as a mitigating circumstance is conceptually the same as EED as a defense, and that the *McClellan v. Commonwealth*[15] definition applies in either case. The "even though the influence of extreme mental or emotional disturbance is not sufficient to constitute a defense to the crime" language in KRS 532.025(2)(b)(2) advises the jurors that the existence of EED that: (1) lacks a reasonable explanation or excuse, or (2) is of lesser degree—i.e., one that does not cause a temporary state of mind *so enraged, inflamed, or disturbed* as to overcome one's judgment and cause one to act uncontrollably—can nevertheless be considered in mitigation of penalty. Accordingly, I believe that, in cases where the evidence supports an instruction on the KRS 532.025(2)(b)(2) mitigating circumstance, the instructions should define EED so that the jury can make a meaningful determination as to whether that mitigating circumstance is present. Here, however, I agree with the result reached by the majority because there was no evidence to warrant a finding of EED, as defined by *McClellan*, in either phase of the trial. And, thus, the error was harmless beyond a reasonable doubt because Caudill could not have been prejudiced by the fact that

the trial court's instructions omitted the *McClellan* definition.

STUMBO, J., joins this concurring opinion.

---

**14.** *Tribbett v. Commonwealth, supra* note 12 at 664 (emphasis added).

**15.** Ky., 715 S.W.2d 464, 468–69 (1986), *cert. denied* 479 U.S. 1057, 107 S.Ct. 935, 93 L.Ed.2d 986 (1987).